BOARD OF EDUCATION OF THE WOODSTOWN–PILESGROVE REGIONAL SCHOOL DISTRICT, PLAINTIFF-APPELLANT, v. WOODSTOWN–PILESGROVE REGIONAL EDUCATION ASSOCIATION, DEFENDANT-RESPONDENT.

Argued November 14, 1979—Decided February 4, 1980.

584

*Mr. John D. Jordan* argued the cause for the appellant (*Messrs. Jordan & Jordan* attorneys; *Mr. Daniel A. Zehner*, on the brief).

*Mr. John E. Collins* argued the cause for *amicus curiae* New Jersey School Boards Association (*Mr. David W. Carroll*, attorney; *Mr. David W. Carroll* and *Mr. John E. Collins*, on the brief).

*Ms. Mary L. Crangle* argued the cause for the respondent (*Messrs. Tomar, Parks, Seliger, Simonoff & Adourian*, attorneys).

*Mr. James R. Zazzali* argued the cause for *amicus curiae* New Jersey Education Association (*Messrs. Zazzali, Zazzali & Whipple*, attorneys).

The opinion of the court was delivered by

SCHREIBER, J.

This controversy between plaintiff, Board of Education of the Woodstown-Pilesgrove Regional School District (Board), and defendant, Woodstown-Pilesgrove Regional Education Association (Association), the bargaining representative of the classroom teachers, arose out of a dispute over two additional hours that school teachers were required to work on the day before Thanksgiving.

The parties had entered into a collective bargaining agreement (Agreement) covering the three-year period from July 1, 1975 through June 30, 1978. The Agreement contained a gener-

al management rights provision that reserved to the Board "sole jurisdiction and authority over matters of policy" including, among others, the right "to direct employees of the school district" and "to maintain the efficiency of the school district operations." On the basis of this authority the Board on February 16, 1976 adopted the 1976-1977 school calendar. That schedule apparently modified a past practice of dismissing teachers and students at 1 p. m. on the day before Thanksgiving. The new calendar required instead a full school day ending at 3 p. m. The schedule was not distributed to the teachers until September 7. On October 25 the association filed a grievance objecting to the change. The Superintendent of Schools denied the grievance asserting that the filing was untimely.

The teachers worked two additional hours on November 24, 1976 and then promptly filed a second grievance seeking additional compensation. A hearing was held before the Superintendent of Schools on December 21, 1976. He did not submit his decision, which denied the relief, until December 28, 1976.

Thereafter the Association filed a third grievance. It asserted that since the Superintendent had not notified the Association of his decision within five days of the hearing as required by the Agreement, the Association's position was automatically sustained. When this grievance was denied, the Association brought the matter to arbitration.

The stipulated issue submitted to the arbitrator was whether the Superintendent's response to the second grievance violated the five-day requirement in the Agreement, and, if so, what the remedy would be. The arbitrator found that the contractual provision had been breached and ordered the Board to pay the teachers for the two hours worked on November 24, 1976.

The Board filed a complaint in the Superior Court, Law Division, in which it demanded that the award be set aside on the ground that the arbitrator exceeded his authority and had no jurisdiction over the subject matter. The Association coun-

terclaimed seeking enforcement of the award. Upon the return day of an order to show cause, the trial court vacated the award. It held that the decision to keep the schools open an additional two hours was a managerial prerogative and, therefore, was not a proper subject for the grievance-arbitration process under the Agreement.

The Association appealed to the Appellate Division. That court, reasoning that the effect of the Board's decision increased the teachers' workload by two hours and thereby affected working terms and conditions, held the subject to be a proper one for negotiation. 164 *N.J.Super.* 106 (1978). Construing the terms of the Agreement, it found that the teachers were not obligated to work the additional two hours and were entitled to payment for that time. The arbitrator's order was reinstated and confirmed for that reason. We granted the Board's petition for certification. 81 *N.J.* 44 (1979).

Preliminarily, we call attention again to our holding in *State v. State Supervisory Employees Ass'n*, 78 *N.J.* 54 (1978), wherein we stated that:

> PERC [Public Employment Relations Commission] is the forum for the initial determination of whether a matter in dispute is within the scope of collective negotiations. PERC's jurisdiction in this area is primary. *See Bd. of Ed. of Plainfield v. Plainfield Ed. Ass'n*, 144 *N.J.Super.* 521, 524–525 (App.Div.1976). *Newark Teachers Union v. Bd. of Ed. of Newark*, 149 *N.J.Super.* 367, 354–375 [*sic*] (Ch.Div.1977). No court of this State is empowered to make this initial determination. For a party dissatisfied with PERC's conclusion, appellate review of PERC's scope determinations is specifically provided by *N.J.S.A.* 34:13A–5.4(d). [*Id.* at 83]

See also *Ridgefield Park Ed. Ass'n v. Ridgefield Park Bd. of Ed.*, 78 *N.J.* 144, 153–154 (1978). The Appellate Division noted that since this proceeding was instituted and adjudicated by the trial court prior to *State v. State Supervisory Employees Ass'n*, it would resolve the matter on the merits rather than remand the cause to PERC. Since an additional period of time has elapsed, the controversies substantially involve principles of law, and we

are fully cognizant of the views of PERC, it is appropriate for us to discuss and resolve the matter. In the future, however, absent extraordinary circumstances, trial courts should transfer the matter to PERC to determine the scope issue. *R.* 1:13–4(a).

Two major issues are involved. First, was the matter one which the parties could properly negotiate and submit to binding arbitration. Second, should we uphold the arbitrator's decision that the failure of the Superintendent to timely notify the parties of his determination on the second grievance precluded the Board from disputing the teachers' claim.

I

The underlying question is the jurisdictional one of whether the subject matter was negotiable and subject to binding arbitration.[1] Its resolution depends upon several factors. Consideration must be given to whether the public employer is exercising an inherent or express managerial prerogative. The very nature of the activity or some statutory or constitutional grant of authority may indicate whether the function is managerial. It may involve the constitutional obligation delegated in part to the Board to provide a thorough and efficient education. See *N.J.Const.*, Art. 8, § 4, par. 1; *N.J.S.A.* 18A:11–1. It may also arise out of commonly recognized management prerogatives such as the right to hire or direct the work force. Or it may follow from a nondelegable legislative directive.

If the public employer has acted pursuant to a managerial prerogative, the inquiry may end at this point. *State v. State*

---

[1]Generally, there are no permissive subjects of negotiation in New Jersey public employment. See *Ridgefield Park Ed. Ass'n v. Ridgefield Park Bd. of Ed.*, 78 *N.J.* 144, 162 (1978). An exception may exist with respect to negotiating by police and firemen, where a permissive category of negotiations, *N.J.S.A.* 34:13A–16(b), *N.J.S.A.* 34:13A–16(f)(4). See *Ridgefield Park*, 78 *N.J.* at 158.

*Supervisory Employees Ass'n,* 78 *N.J.* at 79–80. Thus, if it is " a matter of essential managerial prerogative which has been delegated by the Legislative to the Board [of Education]," it "cannot be bargained away." *Bernards Tp. Bd. of Ed. v. Bernards Tp. Ed. Ass'n,* 79 *N.J.* 311, 321 (1979). In other circumstances whether the function falls within the general category of management authority is only the first phase of the analysis. This may occur when a nonmanagerial decision or the effect of the exercise of a managerial prerogative is involved.

■ Under *N.J.S.A.* 34:13A–5.3, "terms and conditions" of employment are proper subjects of bargaining. Though not explicitly defined, a term and condition of employment "intimately and directly affect[s] the work and welfare of public employees . . .." *State v. State Supervisory Employees Ass'n,* 78 *N.J.* at 67. Rates of pay and working hours would appear to be items most clearly falling within that category, *Englewood Bd. of Ed. v. Englewood Teachers Ass'n,* 64 *N.J.* 1, 6 (1973), although many other factors may intimately and directly touch upon the welfare of the public employee.

Logically pursued, these general principles—managerial prerogatives and terms and conditions of employment—lead to inevitable conflict. Almost every decision of the public employer concerning its employees impacts upon or affects terms and conditions of employment to some extent. While most decisions made by a public employer involve some managerial function, ending the inquiry at that point would all but eliminate the legislated authority of the union representative to negotiate with respect to "terms and conditions of employment." *N.J.S.A.* 34:13A–5.3. Conversely to permit negotiations and bargaining whenever a term and condition is implicated would emasculate managerial prerogatives.

■ To attempt always to reconcile the two by isolating and focusing solely upon the impact or effect of a managerial decision would eliminate the significance of and frustrate pre-

rogatives.[2] We reject that approach,[3] and have previously implied as much in *State v. State Supervisory Employees Ass'n,* 78 *N.J.* 54, and *Bernards Tp. Bd. of Ed. v. Bernards Tp. Ed. Ass'n,* 79 *N.J.* 311. We are aware of PERC's position to the contrary. See *In re Plainfield Bd. of Ed.,* 5 *NJPER* 418 (1979); *In re Tenafly Bd. of Ed.,* 2 *NJPER* 75 (1976); *In re City of Newark,* 2 *NJPER* 139 (1976).

Justice Pashman in *State v. State Supervisory Employees Ass'n,* 78 *N.J.* 54, outlined the general guideline to resolve these conflicting policies. He wrote that only those terms and conditions of employment may be bargained for

---

[2]The approach in the private sector is somewhat different. Under the National Labor Relations Act, an employer must bargain about "wages, hours and other terms and conditions of employment." 29 *U.S.C.* § 159(d). Thus, under the literal terms of the Act an employer would have to bargain about the effects of a managerial decision on those employment conditions. See *NLRB v. Royal Plating & Polishing Co.,* 350 *F.2d* 191, 196 (3 Cir. 1965); *NLRB v. Rapid Bindery, Inc.,* 293 *F.2d* 170, 176 (2 Cir. 1961). Since such bargaining might impose costs on the employer, it could affect the employer's exercise of the managerial decision. But the private employer *could* agree to have even the managerial decision subject to the bargaining process, see *NLRB v. Wooster Division of the Borg-Warner Corp.,* 356 *U.S.* 342, 78 *S.Ct.* 718, 2 *L.Ed.2d* 823 (1958), and thus no countervailing public policy is implicated by imposing impact costs on the employer. In the public sector in New Jersey, on the other hand, some managerial decisions have been specifically entrusted by the Legislature to the public employer. See *Ridgefield Park,* 78 *N.J.* at 162. To impose costs on these decisions by requiring bargaining about their effects conflicts with the public policy expressed by the Legislature that it is management alone which must make these decisions.

[3]We also note that the initial proposal which led to the 1974 amendment to *N.J.S.A.* 34:13A–8.1, would have required that the impact of decisions on terms and conditions of employment be mandatorily negotiable. This language was not adopted. See *State v. State Supervisory Employees Ass'n,* 78 *N.J.* 54, 68 (1978). A bill has been introduced in the State Senate which provides that the impact of a managerial decision is mandatorily negotiable. *S.* 750 (1980).

which intimately and directly affect the work and welfare of public employees and on which negotiated agreement would not *significantly* interfere with the exercise of inherent management prerogatives pertaining to the determination of governmental policy. [78 *N.J.* at 67; emphasis supplied]

■ We perceive of no reason why this principle should not equally apply to express, as well as inherent, managerial prerogatives. The nature of the terms and conditions of employment must be considered in relation to the extent of their interference with managerial prerogatives. A weighing or balancing must be made. When the dominant issue is an educational goal, there is no obligation to negotiate and subject the matter, including its impact, to binding arbitration. Thus these matters may not be included in the negotiations and in the binding arbitration process even though they may affect or impact upon the employees' terms and conditions of employment. See *In re Maywood Bd. of Ed.,* 168 *N.J.Super.* 45, 56–58 (App.Div.1979), certif. den. 81 *N.J.* 292 (1979).

■ On the other hand, a viable bargaining process in the public sector has also been recognized by the Legislature in order to produce stability and further the public interest in efficiency in public employment. When this policy is preeminent, then bargaining is appropriate. Where the condition of employment is significantly tied to the relationship of the annual rate of pay to the number of days worked, then negotiation would be proper even though the cost may have a significant effect on a managerial decision to keep the schools open more than 180 days.

The type of examination which must be made is best illustrated by Justice Pashman's analysis in *Bernards Tp. Bd. of Ed. v. Bernards Tp. Ed. Ass'n,* 79 *N.J.* 311. There the dispute involved the withholding of a teacher's salary increment by a board of education "for inefficiency or other good cause." *N.J.S.A.* 18A:29–14. Clearly the increment directly affected a fundamental term of the teacher's employment, his compensation. However, the board's decision concerned the quality of the

educational system and was an "essential managerial prerogative" which outweighed the impact on the individual's term of employment. 79 *N.J.* at 321, 399 *A.2d* 620. Accordingly, it was held that the decision to withhold the incentive pay increase from a particular teacher could not be bargained away.

Another example may be found in *Ridgefield Park Ed. Ass'n v. Ridgefield Park Bd. of Ed.,* 78 *N.J.* 144, where a teacher objected to a transfer. This Court wrote:

> The selection of the school in which a teacher works or the grade and subjects which he teaches undoubtedly have an appreciable effect on his welfare. However, even assuming that this effect could be considered direct and intimate, we find that this aspect of the transfer decision is insignificant in comparison to its relationship to the Board's managerial duty to deploy personnel in the manner which it considers most likely to promote the overall goal of providing all students with a thorough and efficient education. Thus, we find that the issue of teacher transfers is one on which negotiated agreement would significantly interfere with a public employer's discharge of inherent managerial responsibilities. Accordingly, it is not a matter as to which collective negotiation is mandatory. [*Id.* at 156]

The instant case concerns the school calendar and the number of hours of employment on a particular school day. Establishing the school calendar in terms of when school commences and terminates is a non-negotiable managerial decision. *Cf. Burlington Cty. College Faculty Ass'n v. Burlington Cty. College Bd. of Trustees,* 64 *N.J.* 10, 15–16 (1973), in which we quoted the following language from *Biddeford v. Biddeford Teachers Ass'n,* 304 *A.2d* 387, 421 (Me.Sup.Jud.Ct.1973) (Wernick, J., concurring and dissenting):

> "Thus, the commencement and termination of the school year and the scheduling and length of intermediate vacations during the school year, at least insofar as students and teachers are congruently involved, must be held matters of 'educational policies' bearing too substantially upon too many and important non-teacher interests to be settled by collective bargaining or binding arbitration."

The Legislature has expressly recognized that calendar responsibility belongs to the board. *N.J.S.A.* 18A:36–2 states:

> The board of education shall determine annually the dates, between which the schools of the district shall be open, in accordance with law.[4]

Even more fundamental is the constitutional educational obligation which the Legislature has delegated in large measure to boards of education. It is their responsibility to ensure "that all children receive a thorough and efficient education." *Ridgefield Park Ed. Ass'n v. Ridgefield Park Bd. of Ed.,* 78 *N.J.* at 165. It follows that fixing the number of school days[5] and the hours of instruction per school day[6] fall within a fundamental management prerogative. It is also obvious that establishing the number of those days and the hours of instruction per school day impacts upon the teachers' terms and conditions of employment. It is only when the result of bargaining may significantly or substantially encroach upon the management prerogative that the duty to bargain must give way to the more pervasive need of educational policy decisions. *State v. State Supervisory Ass'n,* 78 *N.J.* at 67. We do not find such a transgression in this case.

The Association does not quarrel with the length of one school year or its commencement or terminal dates. Nor does it question the length of the normal school day. Rather the narrow issue here concerns payment for the hours worked due to

---

[4]The opening date cannot be before July 1 and the closing date cannot be after June 30. *N.J.S.A.* 18A:36–1.

[5]See *N.J.S.A.* 18A:58–16; *N.J.A.C.* 6:27–1.13; *A.G.F.O.* No. 19 (1975), providing for a school year of at least 180 days.

[6]See *N.J.A.C.* 6:20–1.3; *N.J.A.C.* 6:26–2.1, providing generally for a school day of at least four hours. See *N.J.A.C.* 6:3–1.13, full-time teachers must work at least four hours.

the extension of the work period on a day before a holiday from that which previously existed. No statute or regulations dealing with teachers' working hours or compensation would have been violated if the additional two hours had not been scheduled or if the teachers had been compensated for having worked those extra hours. There being no demonstration of a particularly significant educational purpose, and the budgetary consideration being the dominant element, it cannot be said that negotiation and binding arbitration of that matter significantly or substantially trenched upon the managerial prerogative of the board of education. See C. W. Summers, "Public Employee Bargaining: A Political Perspective," 83 *Yale L.J.* 1156, 1194 (1974). A somewhat comparable situation may be found in *Englewood Bd. of Ed. v. Englewood Teachers Ass'n,* 64 *N.J.* 1 (1973). Four special education teachers, employed to instruct retarded children, customarily worked between 8:45 a. m. and 1:30 p. m. Their working hours were lengthened an hour and a quarter each day. We held that their hours were clearly terms and conditions of employment and "items most evidently in the legislative mind" to be subjected to collective bargaining. *Id.* at 7.

## II

Having concluded that the subject was negotiable, we direct our attention to the collective bargaining agreement. The Agreement is not clear on whether the board of education could unilaterally alter the teaching schedule on November 24, 1976. The Appellate Division relied upon Article XXI which stated that "[u]nless otherwise provided in this agreement, nothing contained therein should be interpreted . . . so as to . . . reduce or otherwise detract from any teacher benefit existing prior to" July 1, 1975. 164 *N.J.Super.* at 109–110. Finding that before July 1, 1975 the teachers had worked until 1 p. m. on the day before Thanksgiving, it reasoned that the modification was not permissible. *Ibid.*

However, it is also possible to contend that the Agreement contemplated that the school day was to be fixed by the Board.

The Agreement, which called for 187 teacher days, required teachers to remain no later than 20 minutes after the close of each school day, and on days preceding holidays it was mandated that "the teachers' day shall end at the close of the pupils' day." Since under the Agreement the Board determined the hours during which students were to attend classes, it could reasonably be contended that the Agreement authorized the Board to set the hours of employment on the days before a holiday, including Thanksgiving.

There being a bona fide dispute between the parties as to the interpretation of the contract, a grievance was cognizable. The grievance procedure provided for a prompt hearing and decision within five days by the immediate supervisor. Within five days thereafter the grievant could appeal to the Superintendent of Schools. The Superintendent was required "to establish a hearing within ten (10) days" and "notify the parties in interest of his decision" within five days of the hearing. Thereafter appeals were to be processed before the Board with the same time frames except that the hearing was to be held within 30 days of the request for review.

The next level of review was arbitration. The arbitrator was authorized only to interpret the language of the Agreement; he could not add to, subtract from or alter the language, and he had no power to make an award inconsistent with law.

The issues which reached the arbitrator here were whether the Superintendent had failed to notify the parties of his decision within five days of the hearing and thereby violated the Agreement and, if so, what the remedy should be. The parties had submitted only these issues, and the arbitrator, considering himself bound by the stipulation, refused to consider the merits of the second grievance.

The arbitrator pointed out that the definition in the Agreement of "day" was a calendar day, and that Saturdays, Sundays and State-mandated legal holidays were to be excluded as the last day of the time limit. The hearing had been held on

Tuesday, December 21. He noted that the first day on which the Superintendent could have made his decision known was Wednesday, December 22. The fifth day fell on Sunday and, since Sunday as the last day was to be excluded, the fifth day under the Agreement was Monday, December 27. He reasoned that non-school days and holidays which fell within the five-day period should be counted. Thus he concluded that the Superintendent had not made his determination within five days.

The arbitrator then relied on the literal contract language that "[f]ailure to issue a decision within the specified time limit shall render the grievance settled in favor of the grievant." Having found that the Superintendent's decision had been made on the sixth day, contrary to the Agreement, he concluded that the Association had prevailed on the grievance. He fixed the remedy by awarding damages calculated for the two additional periods worked at an hourly rate of $\frac{1}{7}$th of the teachers' daily rate.

Consistent with his authority the arbitrator interpreted the clauses in dispute. At trial counsel for the Board conceded and the trial court agreed that the arbitrator's interpretation of calculating the five days was correct and that therefore the grievance should be sustained. We agree that this interpretation could reasonably be made, was not inconsistent with law, and was within the guidelines applicable to arbitrations concerning public employment disputes. See *Kearny PBA Local # 21 v. Kearny,* 81 *N.J.* 208, 217 (1979). Accordingly the award should be upheld and judgment entered enforcing it.

Affirmed.

*For affirmance* —Chief Justice WILENTZ and Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—7.

*For reversal* —None.