**PUBLIC EMPLOYEE RELATIONS BOARD, et al., Appellants,**

v.

**WASHINGTON TEACHERS' UNION LOCAL 6, AFT, Appellee.**

Nos. 87–523, 87–524.

District of Columbia Court of Appeals.

Argued Nov. 22, 1988.

Decided March 30, 1989.

Martin B. White, Asst. Corp. Counsel, with whom Frederick D. Cooke, Jr., Corp. Counsel, Charles L. Reischel, Deputy Corp. Counsel, and Lutz Alexander Prager, Asst. Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellant District of Columbia.

Christopher A. Hart, Washington, D.C., for appellant Public Employee Relations Board.

William B. Peer, Washington, D.C., for appellee.

Before MACK, TERRY and STEADMAN, Associate Judges.

STEADMAN, Associate Judge:

The issue in this case is whether the beginning date of the school year and Good Friday's status as a holiday are mandatory subjects of collective bargaining between the District of Columbia Public Schools (DCPS) and the Washington Teachers' Union (WTU). The Public Employee Relations Board's (PERB) determination that they were not was reversed on appeal to the

---

Superior Court. We reinstate the PERB's decision and order.

## I.

In May 1985, DCPS, through its Board of Education, established the school calendar for 1985–86. In variance from prior years, it provided that teachers would start work on August 28, 1985, and that Good Friday would be a regular school day. The closing date of the school year was also moved up so as to leave unchanged the total number of working days. These changes were made without negotiation with the WTU, the teachers' certified bargaining representative.

In June 1985, the WTU filed an unfair labor practice charge against DCPS with the PERB. The matter was heard before a PERB hearing examiner, who concluded, in effect, that DCPS had acted unlawfully in making the unilateral decision to change the school calendar. The PERB, however, rejected the hearing examiner's recommendations and issued a decision and order dismissing WTU's unfair labor practice complaint. It held as a matter of law that the challenged actions of DCPS in setting the 1985–86 school calendar were not subjects of mandatory collective bargaining.

The WTU appealed this determination to the Superior Court. Taking the view that the PERB decision lacked "specific reasoning," the court considered the option of remanding for a fuller explanation. Concluding, however, that a remand would cause further delay, and that the issue was "a straightforward one of law and statutory interpretation which is appropriate for the Court to decide without additional agency input," the court proceeded to address the issue *de novo*, and concluded that the DCPS had committed an unfair labor practice as a matter of law. The PERB

and the District of Columbia (representing DCPS) appeal to this court for review.

## II.

We begin by reiterating two well-established legal principles governing our review of the issue before us. First, although this is an appeal from a review of agency action by the Superior Court rather than a direct appeal to us, we review the administrative decision as if the appeal had been heard initially in this court. *Kegley v. District of Columbia,* 440 A.2d 1013, 1019 (D.C.1982).[1] Second, as we have often stated in decisions of this court, we defer to an agency's interpretation of a statute it administers unless that interpretation is unreasonable in light of the prevailing law, inconsistent with the statute, or plainly erroneous. *See, e.g., Smith v. District of Columbia Dep't of Employment Services,* 548 A.2d 95, 97 (D.C.1988); *Thomas v. District of Columbia Dep't of Employment Services,* 547 A.2d 1034, 1037–38 (D.C.1988); *Lenaerts v. District of Columbia Dep't of Employment Services,* 545 A.2d 1234, 1236 (D.C. 1988). This general standard of review laid down by our case law is emphasized by the express words of the statutory provision authorizing review of PERB decisions, which instructs that the inquiry of the reviewing court is to be whether the decision is "supported by substantial evidence and not clearly erroneous as a matter of law."[2]

The case before us arises under the framework of the Comprehensive Merit Personnel Act (the "Act"), D.C.Code §§ 1–601.1, to 637.2 (1987). One of the purposes of the Act is to "[p]rovide for a positive policy of labor-management relations including collective bargaining between the District of Columbia government and its employees." § 1–601.2(a)(6). To this end, the Act, *inter alia,* establishes the PERB,

1. Appeals from agency determinations in contested cases are normally filed directly with this court pursuant to the District of Columbia Administrative Procedure Act, D.C.Code § 1–1510 (1987). However, the Comprehensive Merit Personnel Act, which governs the operations of the PERB, provides that decisions of the PERB are appealable to the Superior Court. D.C.Code § 1–605.2(12) (1987). Although the subsection deals specifically with decisions made initially

by a three-member panel, its application to PERB decisions generally is not challenged here.

2. D.C.Code § 1–605.2(12) (1987). Although by its terms the provision speaks to review by the Superior Court, we construe it to apply to our review as well. *See supra* note 1.

to consist of five members "who through their experience have demonstrated an expert knowledge of the field of labor relations." § 1–605.1(b). Among the wide-ranging powers entrusted to PERB by the Act is authority to "[d]ecide whether unfair labor practices have been committed" and to "[m]ake a determination in disputed cases as to whether a matter is within the scope of collective bargaining." § 1–605.2(3), (5).

The parties are in general agreement that the issue faced by PERB in this dispute was whether the DCPS decisions with respect to the school calendar were mandatory subjects of collective bargaining, a matter plainly within PERB's scope of responsibility as indicated above. The DCPS invokes § 1–618.8(a) of the Act, which lists among the issues over which management retained sole control, the right "to determine the mission of the agency."[3] It buttresses its general rights under the Act with the specific responsibility given it by D.C.Code § 31–102 (1988), providing that the Board of Education "shall determine all questions of general policy relating to schools." The WTU, on the other hand, besides invoking the general policy in favor of collective bargaining that it sees inherent in the Act,[4] relies specifically on § 1–613.1(a) of the Act, which in relevant part provides:

(a) A basic administrative workweek of 40 hours is established for each full-time employee and the hours of work within that workweek shall be performed within a period of not more than 6 of any 7 consecutive days: Except, that: ... (2)

The basic workweek and hours of work for all employees of the Board of Governors of the School of Law, the Board of Education and the Board of Trustees of the University of the District of Columbia shall be established under rules and regulations issued by the respective Boards: Provided, however, that the *basic work scheduling* for all employees in recognized collective bargaining units shall be subject to collective bargaining, and collective bargaining agreements shall take precedence over the provisions of this subchapter. (Emphasis added.)

WTU points to the portion of the section italicized above, arguing that the beginning and ending dates of the school year and the holidays to be observed within it involve "basic work scheduling." The DCPS, however, asserts that the clause must be read in its context, *i.e.*, that the clause is part of a provision dealing with the permitted number of hours and workdays in a basic workweek, and that the phrase is simply a shorthand summation of the "basic workweek" and "hours of work" dealt with earlier in the section. Neither side cites to any helpful legislative history. Certainly it can be said that the DCPS's reading of the section, which was implicitly adopted by the PERB,[5] is not implausible.

The PERB then was left with the general language of the Act to guide it in its resolution of what it saw as "a classic confrontation between employee interests and management rights." It acknowledged that calendar decisions did affect the conditions of employment of the teachers, but

---

3. The section contained, *inter alia*, the following rights within the category of sole management control:

"(2) To hire, promote, transfer, assign and retain employees in positions within the agency ...

"(4) To maintain the efficiency of the District government operations entrusted to them;

"(5) To determine the mission of the agency, its budget, its organization, the number of employees and the number, types and grades of positions of employees assigned to an organizational unit, work project or tour of duty, and the technology of performing its work...."

4. For example, WTU points out that the very section setting forth sole management rights

provides, in subpart (b), that "[a]ll matters shall be deemed negotiable except those that are proscribed by this subchapter." § 1.618.8(b). It also invokes the general statement of policy that each District employee shall have the right "to engage in collective bargaining concerning terms and conditions of employment, as may be appropriate under this law and rules and regulations...." § 1–618.1(b)(2).

5. The reading advocated by the WTU would seem to conclusively resolve the issue presented to the PERB, and the WTU in its presentation to the PERB specifically invoked this provision of the Act.

recognized that it also had to consider the implications for management. In attempting to fulfill its mission to determine whether the calendar matters before it were mandatory subjects of bargaining, the PERB "carefully weighed the DCPS's right to establish educational policy against the effect of that policy on WTU's members' terms and conditions of employment." It concluded that "the DCPS's right to establish educational policy outweighs the incidental impact of the decisions here upon the teachers' interests," and that the Act, "which authorizes final and binding arbitration, did not intend for a third party neutral to be in a position to rule on subjects that have such high policy implications as these." Accordingly, it found no violation of the Act.

We cannot say that the approach taken by the PERB in carrying out its responsibilities and its interpretation of the Act as applied to the specific dispute before it is plainly erroneous. Faced with a statute which lacked a bright line resolution, the PERB applied its expertise to resolve a difficult question of labor-management relations in the public sector expressly committed to it for decision by the statute.

It is true that the PERB did not set out what it viewed to be the respective elements of the DCPS's right to establish educational policy and the impact upon the conditions of employment of the teachers, and the precise manner in which it engaged in the weighing process. But the PERB was not breaking fresh ground. As it noted in its decision, a number of state courts have specifically dealt with the issue whether the establishment of the opening day of school and subsequent duty days are mandatory subjects of bargaining.[6] Furthermore, the record before the PERB contained ample material discussing the is-

sues at stake. The DCPS, for example, explained its reasons for the earlier school opening in an August 23, 1985, memorandum to the teachers as follows:

—[A]n earlier closing date better accommodates the needs of teachers and other employees (food service workers, bus drivers, etc.) for summer employment and participation in higher education summer programs.

—[T]his calendar more closely coincides with those of surrounding school jurisdictions.

—[R]eleasing students earlier in June reduces the time students and employees may have to work in excessively hot school buildings (more than half of D.C. Public Schools are not air conditioned).

—[T]he calendar allows for an earlier closing date for summer school programs, thus, offering summer employees a longer vacation break prior to the opening of the academic year.

The record before PERB also contained the DCPS's April 23, 1986, Memorandum of Law which outlined in greater detail some of the policy considerations behind the changing of the school calendar.[7] In this memorandum, DCPS emphasized the fact that the new calendar would make it easier for its students to compete for summer jobs, because without the change the students would not be out for the summer vacation until after the students attending schools in neighboring areas. The DCPS also pointed out that summer jobs teach and promote good work habits and skills, a particularly important concern for the majority of students in the D.C. public schools, given the enormously high rate of unemployment for minority teens. The DCPS further noted that college summer sessions were starting earlier than in past years and that the new calendar would

---

6. The PERB decision cites four cases deciding in the negative and three in the affirmative. In fact, as the PERB notes in its exhaustive brief, thirteen out of the nineteen states that have litigated the issue have held that the school calendar is not a mandatory subject for bargaining. *See, e.g., West Hartford Educ. Ass'n v. DeCourcy,* 162 Conn. 566, 295 A.2d 526 (1972); *Eastbrook Community Schools Corp. v. Indiana Educ. Employment Relations Bd.,* 446 N.E.2d

1007 (Ind.App.1983); *Montgomery County Educ. Ass'n v. Board of Education,* 311 Md. 303, 534 A.2d 980 (1987); *Board of Educ. of Woodstown–Pilesgrove v. Woodstown–Pilesgrove Regional Educ. Ass'n,* 81 N.J. 582, 410 A.2d 1131 (1980).

7. *See generally* Agency Proceedings Vol. IV 1141–42, 1153–54.

allow teachers to attend these classes and either obtain or continue certification.

These and like considerations, the PERB could conclude, particularly in light of the relatively small impact of the calendar changes at issue upon the teachers' work schedule, bear "too substantially upon too many and important non-teacher interests to be settled by collective bargaining." *Board of Educ. of Woodstown–Pilesgrove v. Woodstown–Pilesgrove Regional Educ. Assoc.,* 81 N.J. 582, 592, 410 A.2d 1131, 1136 (1980), (quoting *Biddeford v. Biddeford Teachers Ass'n,* 304 A.2d 387, 421 (Me.1973)).

The proceedings before the hearing examiner focused mainly on the issue whether the opening of the school year and the status of Good Friday had been the subject of bargaining in the past and the degree to which the new calendar represented changes from prior practice. The PERB noted the parties' disagreement on these points but otherwise did not treat them as a factor in its decision. However past practice may define the scope of mandatory bargaining in the private sector, we cannot say that the PERB erred in its reluctance to permit the DCPS's statutory responsibility for setting educational policy to be eroded away by the practices of predecessor officeholders. *See Allied Chemical & Alkali Workers of America, Local Union No. 1 v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 187, 92 S.Ct. 383, 401, 30 L.Ed.2d 341 (1971); *NLRB v. Pennsylvania Telephone Guild,* 799 F.2d 84, 90–91 (3d Cir. 1986).

This is not to say that the legal conclusion reached by the trial court would be impermissible. Its error was in proceeding to make the determination *de novo,* rather than recognizing the role that administrative agencies play in interpreting their statutes, a role especially compelling here, where the PERB had express statutory responsibility to determine "whether a matter is within the scope of collective bargaining." The PERB did so here, its determination was not clearly erroneous, and therefore the judgment of the trial court must be set aside and the decision and order of the PERB affirmed.

*So ordered.*