SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

## In the Matter of Robbinsville Township Board of Education v. Washington Township Education Association
### (A-32-15) (076497)

**Argued September 27, 2016 -- Decided November 29, 2016**

**LaVecchia, J., writing for a unanimous Court.**

In this appeal, the Court considers whether its determination in Borough of Keyport v. International Union of Operating Engineers, 222 N.J. 314 (2015), supports a general proposition that, in times of economic crisis, a school board may unilaterally impose furlough days on teaching staff members in contravention of the parties' collective negotiation agreement governing terms and conditions of employment.

The collective negotiation agreement (Agreement) between the Robbinsville Township Board of Education (Board) and the Washington Township Education Association (Association), the major union representative for the employees of the Board, provides that teachers' salaries would be based on the number of school-year work days, or 188 days for new teachers and 185 days for all other teachers.

On March 17, 2010, the State of New Jersey notified the Board that State education funding to the district would be reduced by fifty-eight percent for the upcoming school year. Two days later, the Board asked the Association to re-open contract negotiations for the upcoming year; the Association denied that request on April 9, 2010. Four days later, the Board again asked to re-open negotiations; the Association did not respond. In May 2010, Robbinsville Township notified the Board that its local government financing also would be reduced for the upcoming school year. On May 12, 2010, the Board again asked the Association to re-open negotiations; the Association declined the invitation. The next day, the Board met to discuss the budget and decided to impose three days of involuntary, uncompensated furlough on the remaining teachers, which would reduce the work year from 185 to 182 days.

The Association promptly filed an unfair practice charge with the Public Employment Relations Commission (PERC), alleging violations of both the Agreement and the New Jersey Employer-Employee Relations Act (EERA), N.J.S.A. 34:13A-1 to -43. PERC issued a complaint and notice of hearing to the parties, each of which filed cross-motions for summary judgment.

PERC granted summary judgment in favor of the Board, holding that the imposition of temporary furloughs was a non-negotiable managerial prerogative. The Association appealed, and the Appellate Division affirmed PERC's judgment. The appellate panel relied on the Court's holding in Keyport that "the decision to institute temporary layoffs implicates the same managerial prerogatives as permanent layoffs or subcontracting," particularly "when economy is a factor."

The Court granted the Association's petition for certification. 223 N.J. 557 (2015).

**HELD**: The Court rejects the Appellate Division's mistaken reading of Keyport to authorize the Board's unilateral alteration of a collectively negotiated agreement. Keyport does not stand for the proposition that anytime a municipal public employer can claim an economic crisis, managerial prerogative allows the public employer to throw a collectively negotiated agreement out the window. To the contrary, Keyport painstakingly emphasized the significance of an agency of State government enacting a temporary emergency regulation to provide local governmental managers with enhanced prerogatives. The regulation's existence made all the difference in Keyport, and there is a lack here of an authorizing temporary emergency regulation that permitted temporary furloughs. Keyport does not support the award of summary judgment to the Board.

1. The scope of public employment negotiation is divided into two categories of subject matter: mandatorily negotiable subjects and non-negotiable matters of governmental policy. When an issue falls within a middle-ground area, a court must determine whether the issue should be resolved through the political process or through collective negotiations. The Court has adopted a three-part test to make that determination, holding that an issue involving public employment is properly negotiable when: "(1) the item intimately and directly affects the work and welfare of public employees; (2) the subject has not been fully or partially preempted by statute or regulation; and (3) a negotiated agreement would not significantly interfere with the determination of governmental policy." In re Local 195, IFPTE v. State, 88 N.J. 393, 404 (1982). (pp. 8-9)

2. Rates of pay and working hours are quintessential terms and conditions of employment and are mandatorily negotiable terms. Conversely, public employers have a non-negotiable managerial prerogative to reduce the workforce by permanently laying off employees. Those two areas—hours/wages and the right to reduce the workforce—came into conflict in the appeals from three separate PERC cases consolidated in Keyport. In two of those cases, municipalities had imposed mandatory but temporary layoffs by reducing the number of work days over a specific time period without prior negotiations; the third municipality had replaced three full-time positions with part-time positions. (pp. 9-11)

3. In Keyport, the Court noted that an emergency regulation had been promulgated in response to the 2008 economic crisis. That regulation authorized certain municipalities to temporarily lay off employees when faced with exigent financial circumstances. When the Court applied the three-prong Local 195 test, it found the first prong plainly met because the temporary layoffs impacted work hours and compensation. It also found the second prong met, inasmuch as permission to effect temporary layoffs did not rise to the level of preemption. When balancing the interests of the employers and employees pursuant to the third prong, however, the Court found that the emergency regulation buttressed the municipalities' right to implement the temporary layoffs. (pp. 11-13)

4. The Court notes that the Appellate Division erred in deriving from Keyport the general principle that financial considerations "are indisputably a legitimate basis for a layoff of any type." Keyport, supra, 222 N.J. at 343-44. The appellate decision undervalued the lack here of an authorizing temporary emergency regulation that permitted temporary furloughs—a factor that had the significant impact of tilting the public policy calculus in Keyport's analysis under the third prong of Local 195. Had the temporary regulation not provided that extra managerial authority, the fact patterns in the Keyport cases would have foundered on the third-prong analysis. (pp. 13-15)

5. Allowing a claimed need for management prerogative to prevail in tight budgetary times in order for municipal government policy to be properly determined would eviscerate the durability of collective negotiating agreements. The Legislature and the Court have, time and again, emphasized the value of collective negotiated agreements in society. By reading Keyport to authorize the Board's unilateral alteration of a collective negotiated agreement, the Appellate Division erroneously expanded Keyport, rendering it unrecognizable. The Court rejects that mistaken reading and unwarranted extension of Keyport. (pp. 15-17)

6. The Court declines to consider the Board's argument that its actions were authorized under a section of the Agreement. First, PERC and the appellate panel rested their respective holdings on Keyport, not on the Agreement. Second, the Board did not file a cross-petition for certification to pursue this argument. Finally, it would not be appropriate for the Court to interpret the Agreement in light of the posture of the case; instead, the parties have their negotiated dispute resolution mechanism to resolve interpretive matters. (pp. 17-19)

The judgment of the Appellate Division is **REVERSED**. The matter is **REMANDED** for any further proceedings consistent with this opinion.


**JUSTICES ALBIN, PATTERSON, FERNANDEZ-VINA, SOLOMON, and TIMPONE** join in **JUSTICE LaVECCHIA's opinion. CHIEF JUSTICE RABNER did not participate.**

IN THE MATTER OF

ROBBINSVILLE TOWNSHIP BOARD
OF EDUCATION,

    Defendant-Respondent,

        v.

WASHINGTON TOWNSHIP EDUCATION
ASSOCIATION,

    Plaintiff-Appellant.


        Argued September 27, 2016 – Decided November 29, 2016

        On certification to the Superior Court,
        Appellate Division.

        Keith Waldman argued the cause for appellant
        (Selikoff & Cohen, attorneys; Mr. Waldman
        and Kathleen L. Kirvan, on the briefs).

        Matthew J. Giacobbe argued the cause for
        respondent Robbinsville Township Board of
        Education (Cleary, Giacobbe, Alfieri,
        Jacobs, attorneys; Robin T. McMahon, on the
        letter brief).

        Don Horowitz, Acting General Counsel, argued
        the cause for respondent New Jersey Public
        Employment Relations Commission.


    JUSTICE LaVECCHIA delivered the opinion of the Court.

    In this appeal we consider the argument that our earlier

determination in Borough of Keyport v. International Union of

Operating Engineers, 222 N.J. 314 (2015), supports a general

1

proposition that, in times of economic crisis, a school board may unilaterally impose furlough days on teaching staff members in contravention of the parties' collective negotiation agreement governing terms and conditions of employment.

Acting in response to significant funding reductions and citing managerial prerogative, the Robbinsville Township Board of Education (Board) announced a decision to impose involuntary furlough days on teachers knowing that the furloughed days would negatively impact the affected employees' wages. An unfair labor practice charge was filed with the Public Employment Relations Commission (PERC), challenging the Board's action as violating the parties' collective negotiation agreement and the New Jersey Employer-Employee Relations Act (EERA), N.J.S.A. 34:13A-1 to -43.

In granting summary judgment to the Board, PERC relied on the Appellate Division's decision in Keyport. The Washington Township Education Association (Association) appealed, and the Appellate Division affirmed PERC's determination. The panel's reasoning assumed that this Court's modified affirmance in Keyport supported the Board's ability to act unilaterally to impose the furloughed days.

Because the Appellate Division decision is based on an overly broad and mistaken reading of our determination in

Keyport, we reverse to correct the judgment and to prevent improper expansion of our circumscribed holding in Keyport.

I.

The Association is the major union representative for employees of the Board. Relevant to the events in this matter, the Board and the Association were bound by a collective negotiation agreement (Agreement) during the period of July 1, 2008 through June 30, 2011. According to Article 5.3 of the Agreement, the teachers' salaries were based on the number of school-year work days, which contract negotiations established to be 188 days for new teachers and 185 days for all other teachers.

On March 17, 2010, during a time of declared "fiscal emergency," the State of New Jersey notified the Board that State education funding to the district would be reduced by fifty-eight percent for the upcoming 2010-2011 school year. Reeling from that significant funding reduction, the Board took action: it revised its budget for the next school year by cutting educational programs, freezing salaries, and laying off approximately thirteen teaching and staff positions. Because those attempts were insufficient to balance the school district's budget, on March 19, 2010, the Board asked the Association to re-open contract negotiations for the 2010-2011 school year. On April 9, 2010, the Association, citing its

3

members' best interests, declined to re-open discussions mid-contract.  The Association also did not respond to the Board's subsequent request on April 13 to reconsider re-opening negotiations.

In May 2010, Robbinsville Township notified the Board that local government financial support to the school district also would be reduced for the upcoming school year.  On May 12, 2010, the Board again asked the Association to re-open contract discussion for purposes of the 2010-2011 school year and again the Association declined the invitation.  The next day, the Board met to approve methods by which it could reduce the budget shortfall, which included, among other things, imposing three days of involuntary, uncompensated furlough on the remaining teachers.  The furlough days were scheduled to take place on non-educational, professional development days, reducing the overall work year from 185 days to 182 days.  The Board informed the faculty of its decision via e-mail later that day.

The Association promptly filed an unfair practice charge with PERC, asserting that the Board violated the EERA, as well as the Agreement, by unilaterally and without negotiation reducing the teachers' workdays, negatively impacting their salaries.[1]  PERC issued a complaint and a notice of hearing to

---

[1]  Before PERC and the Appellate Division, the Association also challenged the Board's e-mail communication as contravening the

the parties, each of which filed cross-motions for summary judgment. While PERC's decision was pending, the Appellate Division issued an unpublished opinion in the consolidated appeals in Borough of Keyport v. International Union of Operating Engineers, which addressed the negotiability of temporary furloughs imposed in the affected civil service jurisdictions. Thereafter, on November 21, 2013, PERC rendered its decision in the instant matter, granting the Board's motion for summary judgment and denying the Association's motion, holding that the decision to impose temporary furloughs in the current economic climate was a non-negotiable managerial prerogative.

The Association appealed PERC's decision to the Appellate Division, and the panel affirmed, stating that it relied on this Court's holding in Keyport that "the decision to institute temporary layoffs implicates the same managerial prerogatives as permanent layoffs or subcontracting," particularly "when economy is a factor."

The Association's petition for certification to this Court was granted on December 8, 2015. 223 N.J. 557 (2015).

II.

---

EERA; however, that issue is not included in the appeal to this Court.

The Association argues that PERC and the Appellate Division erroneously applied Keyport in this case. The Association contends that Keyport's judgment, upholding decisions to temporarily lay off public employees as a non-negotiable managerial prerogative, was based not only on the existence of harsh economic circumstances but also on regulatory authority to impose temporary furloughs that was applicable only to civil service jurisdictions. The Association notes that the actions of the Keyport employers were authorized by a then-existing Civil Service Commission emergency regulation permitting temporary layoffs due to the economic climate, and it emphasizes this Court's reliance on that emergency regulation in upholding the Keyport employers' right to unilaterally impose the furloughs. See Keyport, supra, 222 N.J. at 343 (referencing "[the] clear expression of legitimate public policy authorizing" managerial prerogative to impose contested furloughs). The Association notes that, conversely, no such expression of public policy exists here. The Association maintains that it asks too much of this Court's reasoning in Keyport to extend that limited holding to public employers throughout the state.

The Association additionally relies on the fact that the Keyport municipalities' layoff plans had been subjected to independent review and approval by the Civil Service Commission, and no similar independent third party exercised oversight over

6

the Board's actions.  And, for the first time in this appeal, the Association adds that, at the very least, the Board should have been required to negotiate the impact of its unilateral decision because the furloughs would adversely impact employee compensation and negotiating would not have substantially interfered with the Board's managerial prerogative.

The Board argues that this case aligns with Keyport, which, it contends, did not turn on the Civil Service Act or the temporary emergency regulation but rather on "the municipalities' 'right to lay off employees under prior case law.'"  (Quoting Keyport, supra, 222 N.J. at 344-45).  Moreover, the Board asserts that requiring negotiation before imposing temporary furloughs would require the Board to "leav[e] significant matters of government policy to collective negotiations . . . rather than governmental bodies."  Last, the Board argues that this Court should not consider the Association's argument regarding negotiating the furloughs' impact because that argument was not raised before PERC or the Appellate Division and because the Association waived the opportunity to negotiate impact by thrice declining to meet with the Board when asked to re-open negotiations.

Participating pursuant to Rule 2:6-4, the quasi-judicial decision-maker, PERC, contended in briefs filed with this Court and the Appellate Division that it properly decided this case

7

because it is required to "follow and apply pertinent judicial precedent," like the Appellate Division's decision in Keyport. PERC further argued that civil service regulations and the emergency regulation identified in this Court's decision in Keyport do not provide a "basis to distinguish between civil service municipalities and other public employers."

                              III.

This Court reaffirmed and applied in Keyport certain bedrock principles governing the scope of collective negotiations in the public sector.

Fundamentally, the scope of public employment negotiation is divided, for purposes of analysis, into two categories of subject matter comprised of mandatorily negotiable subjects and non-negotiable matters of governmental policy.  Keyport, supra, 222 N.J. at 333 (citations omitted).  Often those categories are readily distinguished.  However, in recognition that courts must wade in when conflicts arise over the competing interests of public employers and public employees in middle-ground areas, this Court decades ago dictated the approach to be employed when a court must determine "whether an issue is appropriately decided by the political process or by collective negotiations." Id. at 333-34.

The now time-honored test for such situations was announced in the 1982 decision of In re Local 195, IFPTE v. State, 88 N.J.

                              8

393 (1982). The Court stated that a subject involving public employment is properly negotiable when it satisfies a three-part test: "(1) the item intimately and directly affects the work and welfare of public employees; (2) the subject has not been fully or partially preempted by statute or regulation; and (3) a negotiated agreement would not significantly interfere with the determination of governmental policy." Local 195, supra, 88 N.J. at 404. As to the third prong of that test, a reviewing court must "balance the interests of the public employees and the public employer," id. at 404-05, and will hold that negotiation is permitted "on a subject that intimately and directly affects the work and welfare of public employees unless such negotiated agreement would significantly interfere with the determination of governmental policy," id. at 404.

The "prime examples" of mandatorily negotiable terms and conditions of employment under New Jersey case law "are rates of pay and working hours." Id. at 403. In recognition of the preeminence of pay and working hours as quintessential terms and conditions of employment, New Jersey decisions hold that "[a]lthough the establishment of a school calendar is a managerial prerogative, a decision that directly impacts the days worked and compensation for those days implicates a term and condition of employment," rendering the decision one that involves "a mandatorily-negotiable term of employment." Troy v.

9

Rutgers, 168 N.J. 354, 384 (2001); see also Bd. of Educ. v. Woodstown-Pilesgrove Reg'l Educ. Ass'n, 81 N.J. 582, 594 (1980) (finding no encroachment on management prerogative by requiring school board to negotiate lengthening school-day hours despite school district's "budgetary consideration being the dominant element" in that decision); Piscataway Twp. Bd. of Educ. v. Piscataway Twp. Principals Ass'n, 164 N.J. Super. 98, 100 (App. Div. 1978) ("We have no doubt that the matter of length of the work year and its inseparable concomitant -- compensation -- are terms and conditions of employment, . . . and consequently the subject of mandatory negotiation before being put into effect by the public employer.").

Conversely, there is no dispute, either in law or in the positions taken by the parties in this action, that public employers have a non-negotiable managerial prerogative to reduce the workforce by permanently laying off employees. See N.J.S.A. 18A:28-9 (providing right of "board of education to reduce the number of teaching staff members . . . whenever, in the judgment of the board, it is advisable to abolish any such positions for reasons of economy"); State v. State Supervisory Emps. Ass'n, 78 N.J. 54, 88 (1978) (noting that "a decision to cut the work force to a certain number unquestionably is a predominantly managerial function").

10

Those two areas -- hours/wages and the right to reduce the workforce -- came into conflict in the appeals involved in Keyport. In Keyport, supra, we recognized, again, that work days and compensation are terms and conditions of employment, mandating negotiations. 222 N.J. at 340. We concluded, however, in that unique matter, that a public employer could unilaterally alter employees' rates of pay and work days "in accordance with a duly authorized temporary layoff plan" during a time of acute economic crisis. Id. at 343.

Keyport arose from three separate PERC cases, all of which addressed the actions of civil service municipalities. Id. at 319. Two municipalities involved in that appeal imposed "mandatory, but temporary, layoffs, in the form of a reduced number of work days over a specified period of time" without prior negotiations, and the third replaced "three full-time clerical positions . . . with part-time positions," eliminating the affected employees' health benefits. Ibid. Importantly, "all three layoff plans had been submitted and approved by the Civil Service Commission . . . as compliant with all civil service requirements for a layoff action." Ibid. In addressing the three cases, this Court noted that, due to the 2008 economic crisis, an emergency regulation was promulgated that temporarily authorized "[m]unicipalities governed by the civil service

11

system . . . to [temporarily] lay off employees when facing exigent financial circumstances." Id. at 320.

Our analytic approach to the three matters in Keyport resorted to the well-established, three-prong analysis from Local 195 to determine the negotiability of the temporary furloughs. We found the first factor plainly satisfied because the temporary layoffs impacted the employees' work hours and compensation, "intimately and directly affect[ing] the work and welfare" of the employees. Id. at 334, 336 (quoting Local 195, supra, 88 N.J. at 404). Next, we determined that the regulation at issue did not preempt the EERA's mandate to negotiate rates of pay and hours of work: the regulation merely permitted temporary layoffs, whereas preemption requires a statute or regulation that leaves "no room for debate on the matter of discretion" and "fixes a term and condition of employment expressly, specifically and comprehensively." Id. at 337 (quotation marks and citation omitted). In that respect, our decision reversed a contrary determination by the Appellate Division in Keyport that had found preemption applicable. Id. at 340-41.

Instead, in our analysis, the critical question turned on the third prong, which required a balancing of the public employer's interest in "the determination of governmental policy" and the employees' interest in "the[ir] work and

12

welfare." Id. at 341 (quoting Local 195, supra, 88 N.J. at 404). We recognized the "emergency regulation authorizing temporary layoffs [due to] the extant financially distressing conditions" to be a "clear expression of legitimate public policy authorizing such actions to be taken." Id. at 343. Although the municipalities did not specifically rely on the regulation, for this Court it was important that the municipalities acted while the emergency regulation was in effect and the municipalities did face financial crisis. Those circumstances specifically and directly prompted Keyport's holding: "These civil service municipalities, when faced with fiscal exigency, had the right to lay off employees under prior case law and as buttressed by the emergency regulation then in effect authorizing temporary layoff actions." Id. at 344-45 (emphasis added).

### IV.

In the matter under review, the Appellate Division also employed the Local 195 three-prong test and concluded that, despite the fact that the terms and conditions at issue were prime examples of negotiable employment terms, negotiation was not necessary because it would "impinge on the determination of public policy." (Citing Keyport, supra, 222 N.J. at 341).

Although the Appellate Division correctly determined that the first and second prongs of Local 195 are not at issue in

13

this case -- because the action here, in impacting work hours and pay, directly affects the employees' work and welfare and because there is no statute or regulation preempting the EERA -- the panel misapplied our holding in Keyport when analyzing the third prong of the test.  Concerning that third prong, the Appellate Division concluded that the economic crisis present in the Robbinsville school district permitted the Board to forego negotiations on the furloughs.  The panel stated that it reached that determination because the Board was attempting to "achieve a balance between the interests of public employees and the need to maintain and provide reasonable services," and because, pursuant to Keyport, "economic considerations 'are indisputably a legitimate basis for a layoff of any type.'"  (Quoting Keyport, supra, 222 N.J. at 343-44).

The appellate decision undervalued the lack here of an authorizing temporary emergency regulation that permitted temporary furloughs -- a factor that had the significant impact of tilting the public policy calculus in Keyport's analysis under the third prong of Local 195.  Keyport does not stand for the proposition that anytime a municipal public employer can claim an economic crisis, managerial prerogative allows the public employer to throw a collectively negotiated agreement out the window.  To the contrary, Keyport painstakingly emphasized the significance of an agency of State government enacting a

14

temporary emergency regulation to provide local governmental managers with enhanced prerogatives in handling the extraordinary fiscal times faced in the late 2000s. The regulation's existence made all the difference in Keyport. It was mentioned by the Court repeatedly throughout the opinion. See Keyport, supra, 222 N.J. at 343, 344, 345.

This Court determined that the emergency regulation promulgated by the governmental agency overseeing layoff activity in civil service jurisdictions purposefully added to the managerial discretion reposed in the municipalities and, further, that it added weight to the Court's conclusion that forcing the civil service municipalities involved in Keyport to abide by their respective "negotiated agreement[s] would significantly interfere with the determination of governmental policy." Id. at 341 (emphasis added) (quoting Local 195, supra, 88 N.J. at 404). That was underscored by the Court's recognition of the regulation's importance to the prong-three analysis under Local 195 regardless of whether the regulation was the express impetus for the municipalities' decisions. Keyport, supra, 222 N.J. at 345.

Had the temporary regulation not provided that extra managerial authority, the fact patterns in the three consolidated cases in Keyport would have foundered on the third-prong analysis. Allowing a claimed need for management

15

prerogative to prevail in tight budgetary times in order for municipal governmental policy to be properly determined would eviscerate the durability of collective negotiated agreements. Collective negotiated agreements -- promises on wages, rates of pay, and hours, and other traditional terms and conditions of employment -- would mean nothing in the wake of any financial setback faced by a local governmental entity. That drastic public-policy course alteration was not explicit or implicit in the opinion setting forth the reasoning to support our holding in Keyport. We do not endorse it now for to do so would undermine Local 195 and decades of public sector labor law on collective negotiations.

To that end, the Legislature and this Court have, time and again, emphasized the value of collective negotiated agreements in our society. The Legislature enacted the EERA to serve the interests of New Jersey citizens by preventing labor disputes through such agreements. N.J.S.A. 34:13A-2; see also N.J.S.A. 34:13A-5.3 (requiring representatives of employers and employees to "meet at reasonable times and negotiate in good faith with respect to . . . terms and conditions of employment," and requiring that such agreements be written and signed). This Court also has recognized the "wisdom of pursuing discussion between public employers and employees," which "promote[s] labor peace and harmony." Local 195, supra, 88 N.J. at 409; see also

16

Teaneck Bd. of Educ. v. Teaneck Teachers Ass'n, 94 N.J. 9, 18-19 (1983). And, the Court has encouraged negotiations, stating that "[s]tate officials would be derelict in their public responsibilities" if they failed to negotiate. Local 195, supra, 88 N.J. at 409.[2] Thus, by reading Keyport to authorize the Board's unilateral alteration of a collective negotiated agreement, the Appellate Division erroneously expanded Keyport, rendering it unrecognizable. We reject that mistaken reading and unwarranted extension of Keyport. Keyport does not support the award of summary judgment to the Board.

V.

For completeness, we note that in oral argument before this Court the Board contended, as an alternative ground for affirmance, that although the Board does not have the benefit of a temporary regulation or other governmental authorization for its unilateral imposition of temporary furloughs on school district faculty and staff, the Board's action was authorized by Article 4.1 of the Agreement.[3] Among other things, that article provides the Board with the power "to determine the methods,

---

[2] We likewise recognize that public employees disregard their duties if they do not engage in negotiations fairly and in good faith. Here, the Association thrice declined to engage in negotiations, despite awareness of the Board's dire financial circumstances and limited options.

[3] We note that the Board did not reference the article in its answer to the unfair labor practice charge.

17

means and personnel by which whatever actions might be necessary to carry out the mission of the school district in situations of emergency." Accordingly, the Board argues that the Agreement enables this case to fall within the exception to mandatory negotiability carved out by Keyport.

We do not consider that alternative argument for a number of reasons.

First, the decisions of PERC and, on appeal, the Appellate Division do not support the argument that the Agreement's language had an impact on their respective holdings. Each holding rested on its interpretation of Keyport.

Second, the Board did not file a cross-petition for certification in which it could, potentially, have raised an alternative basis for affirming the judgment of the Appellate Division.

Finally, we do not consider in this appeal whether Article 4.1 provides the clarity of authority equivalent to the previous civil service emergency regulation that plainly authorized temporary furloughs as a legitimate layoff action. See Keyport, supra, 222 N.J. at 338. The Board's assertion implicates a question of contract interpretation affecting the determination of contract rights. The parties have their negotiated dispute resolution mechanism available to invoke in order to resolve such interpretative matters. In the posture in which this

18

argument has arisen, it would not be appropriate for this Court to become involved in contract interpretation.

Thus, for the reasons previously explained, our decision in Keyport was misapplied in this matter. Keyport does not provide the Board with the authority to have unilaterally imposed unpaid furlough days on teaching staff members in the 2010-2011 school year.

## VI.

The judgment of the Appellate Division is reversed and the matter is remanded for any further proceedings consistent with this opinion.

JUSTICES ALBIN, PATTERSON, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in JUSTICE LaVECCHIA's opinion. CHIEF JUSTICE RABNER did not participate.

19