SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**IMO Borough of Keyport v. Local 68 (A-43/44-13) (072361)**

**Argued October 20, 2014 -- Decided July 14, 2015**

**LaVECCHIA, J., writing for a majority of the Court.**

The issue in this appeal is whether three municipalities were required to negotiate with union representatives before taking layoff actions that negatively impacted the hours and wages of affected employees.

In 2009, the municipalities of Belmar, Mount Laurel, and Keyport (collectively the municipalities), were experiencing financial strain in light of a pervading and lingering economic downturn. All three municipalities were operating under collective negotiation agreements (CNAs) with unions representing municipal employees: For Keyport the International Union of Operating Engineers, Local 68 (Local 68); for Belmar the Communications Workers of America, AFL-CIO (CWA); and, for Mount Laurel the American Federation of State, County and Municipal Employees, Council 71, South Jersey Public Employers (AFSCME). Following various efforts to confront their individual budget crises, each municipality obtained approval from the Civil Service Commission (Commission) for a layoff plan. Keyport's plan called for the conversion of three full-time clerical positions into part-time positions; as a result, the affected employees lost their eligibility for health benefits. The plan stated that Keyport's preliminary 2009 budget exceeded the levy cap by $135,000 and that "the Borough must reduce its appropriations so that it may lawfully adopt a budget for 2009." Belmar's temporary layoff plan provided for ten involuntary unpaid furlough days for all Department of Public Works employees. Belmar described the furloughs as necessary to achieve a budget that would comply with the State-mandated tax levy cap. Mount Laurel's plan called for the imposition of eight involuntary furlough days on all township employees except police and emergency medical personnel. Mount Laurel represented that the layoffs were necessary to help offset the township's budget crisis and to address restoration of the township's budgetary surplus. None of the municipal layoff actions were negotiated with union representatives.

The unions in each municipality brought scope-of-negotiations challenges to the municipal actions. The Public Employment Relations Commission (PERC), in separate decisions, held that the municipalities violated the New Jersey Employer-Employee Relations Act (EERA), N.J.S.A. 34:13A-1 to -39, and required each municipality to negotiate the changes in terms and conditions of employment. PERC applied the three-part test set forth in Local 195, IFPTE v. State, 88 N.J. 393, 404-05 (1982), for resolving questions about the scope of public sector employment negotiations. In Local 195, the Court established that a subject is negotiable when: "(1) the item intimately and directly affects the work and welfare of public employees; (2) the subject has not been fully or partially preempted by statute or regulation; and (3) a negotiated agreement would not significantly interfere with the determination of governmental policy." Id. at 404. PERC determined that the layoffs in each municipality directly affected employee work and welfare, that the subject of negotiation was not preempted by statute or regulation, and that the municipalities did not have the managerial prerogative to unilaterally implement the layoffs because negotiations would not significantly interfere with governmental policy.

The three municipalities appealed their PERC administrative determinations. The Appellate Division observed that the Commission had approved all three layoff plans during the time when the Commission's emergency regulation permitting "temporary layoffs," N.J.A.C. 4A:8-1.1A, was in effect. Applying the three-part test from Local 195, the Appellate Division determined that the unions met the first prong because all of the actions at issue directly affected the work and welfare of public employees. However, aside from Keyport's action eliminating health benefits, the panel concluded that "the unions did not satisfy the second and third prongs of the [Local 195] test because the municipalities' actions complied with the Civil Service Act and its regulations, and the decisions to furlough and demote employees were non-negotiable policy determinations." The panel affirmed the order in Keyport that required arbitration of the health benefits issue but reversed PERC in respect of the reduction in hours in Keyport and in all respects in the Mount Laurel and Belmar cases.

The Supreme Court granted Local 68's petition for certification and CWA's and AFSCME's joint petition for certification.

**HELD:** The three municipalities in this case acted for reasons of economy based on municipal fiscal distress existing at the time, rendering the management choice to use a temporary or permanent layoff solution one that constituted a managerial prerogative not subject to negotiation. The layoff actions at issue in this consolidated appeal constituted non-negotiable subjects under prong three of the Local 195 test for negotiability. Local 195, IFPTE v. State, 88 N.J. 393 (1982).

1. In Local 195, the Court explained that public policy properly is determined through the political process, by which citizens hold government accountable, and not through collective negotiation. The Court articulated the three-part test applied by PERC to the three municipalities in this case. In respect of the first factor, "rates of pay and working hours" are noted models for the type of subjects that "'intimately and directly affect[] the work and welfare of public employees.'" Local 195, supra, 88 N.J. at 403. A subject is preempted, and therefore non-negotiable under the second factor, when a statute or regulation "'speak[s] in the imperative and leave[s] nothing to the discretion of the public employer.'" Id. at 403-04. The third factor requires that interference with the determination of government policy be significant in order to defeat negotiability. Id. at 404. A matter's negotiability turns not "on the talismanic application of labels such as 'terms and conditions of employment' or 'managerial prerogatives[]' [but r]ather, the inquiry focuses on the extent to which collective negotiations will interfere with the establishment and effectuation of governmental policy." Id. at 420 (Handler, J., concurring and dissenting). (pp. 23-28)

2. Prong one of the Local 195 test is not in issue in this matter. In all three disputes, the layoff actions resulted in reduced hours of work, with resultant reductions in pay, for the affected employees. Prongs two and three of the test are the factors in issue. The preemption standard for prong two is clear in its limits and rigid within its parameters. When legislation or a regulation "establishes a specific term or condition of employment that leaves no room for discretionary action, then negotiation on that term is fully preempted." Local 195, supra, 88 N.J. at 403. The statute and implementing regulations that authorize a layoff of public sector employees lack an imperative nature. Thus, they do not satisfy the essential requirement for preemption to pertain and preclude negotiation based on the second prong of Local 195. Likewise, emergency regulation N.J.A.C. 4A:8-1.1A did not mandate an action by public sector employers affecting terms and conditions of employment for public employees. Neither N.J.A.C. 4A:8-1.1A nor civil service statutes and regulations governing traditional layoff actions preempt negotiation on the basis of prong two of the Local 195 test. (pp. 28-35)

3. Based on a well-established analysis performed under prong three of the Local 195 test, layoffs consistently have been held to be outside of the scope of negotiations: "[N]egotiation will be allowed on a subject that intimately and directly affects the work and welfare of public employees unless such negotiated agreement would significantly interfere with the determination of governmental policy." Local 195, supra, 88 N.J. at 404. Application of that balancing of interests under prong three has deep roots when it comes to the decision to lay off and thereby adjust a public workforce involved in the delivery of public services. There is no room for mandatory negotiation in the determination to reduce a workforce. Public managers must be the ones accountable to the people for such substantive policy decisions. The Local 195 Court was unanimous in deciding to keep matters involving predominantly managerial prerogative out of the negotiations process. (pp. 35-38)

4. Economic reasons are indisputably a legitimate basis for a layoff of any type. The three municipal governments in this case took action while the Commission's emergency regulation authorizing temporary, as well as permanent, layoff plans was in effect. These civil service municipalities, when faced with fiscal exigency, had the right to lay off employees under prior case law and as buttressed by the emergency regulation then in effect authorizing temporary layoff actions. All three municipalities acted for reasons of economy based on municipal fiscal distress existing at the time, rendering the management choice to use a temporary or permanent layoff solution one that constituted a managerial prerogative not subject to negotiation. The layoff actions at issue in this consolidated appeal constituted non-negotiable subjects under prong three of the Local 195 test for negotiability. (pp. 38-46)

The judgment of the Appellate Division is **AFFIRMED** as **MODIFIED**.

**JUSTICE ALBIN**, **DISSENTING**, expresses the view that the majority opinion sweeps away nearly fifty years of this Court' public-sector labor jurisprudence, giving municipal employers the unilateral power to reduce the wages and hours of public employees promised in collective negotiations agreements.

**JUSTICES PATTERSON and SOLOMON, and JUDGE CUFF (temporarily assigned) join in JUSTICE LaVECCHIA's opinion.  JUSTICE ALBIN filed a separate, dissenting opinion.  CHIEF JUSTICE RABNER and JUSTICE FERNANDEZ-VINA did not participate.**

IN THE MATTER OF BOROUGH OF
KEYPORT,

     Respondent-Respondent,

        v.

INTERNATIONAL UNION OF
OPERATING ENGINEERS, LOCAL
68,

     Petitioner-Appellant.

_____

IN THE MATTER OF BOROUGH OF
BELMAR,

     Respondent-Respondent,

        v.

COMMUNICATIONS WORKERS OF
AMERICA, AFL-CIO,

     Petitioner-Appellant.

_____

TOWNSHIP OF MOUNT LAUREL,

     Respondent-Respondent,

        v.

COMMUNICATIONS WORKERS OF
AMERICA,

     Petitioner,

       and

AFSCME, COUNCIL 71, SOUTH
JERSEY PUBLIC EMPLOYEES,

1

Petitioner-Appellant.

Argued October 20, 2014 – Decided July 14, 2015

On certification to the Superior Court, Appellate Division.

Steven P. Weissman argued the cause for appellants Communications Workers of America, AFL-CIO and AFSCME, Council 71, South Jersey Public Employees (Weissman & Mintz, attorneys; Mr. Weissman and Ira W. Mintz, on the briefs).

Raymond G. Heineman argued the cause for appellant International Union of Operating Engineers, Local 68 (Kroll Heineman Carton, attorneys).

Jonathan F. Cohen argued the cause for respondent Borough of Belmar (Apruzzese, McDermott, Mastro & Murphy, attorneys).

Joseph F. Betley argued the cause for respondent Township of Mount Laurel (Capehart Scatchard, attorneys; Mr. Betley and Kelly E. Adler, on the letters in lieu of brief).

Gordon N. Litwin argued the cause for respondent Borough of Keyport (Litwin & Provence, attorneys).

Martin R. Pachman, General Counsel, argued the cause for respondent New Jersey Public Employment Relations Commission.

Richard A. Friedman argued the cause for amicus curiae New Jersey Education Association (Zazzali, Fagella, Nowak, Kleinbaum & Friedman, attorneys; Mr. Friedman and Edward M. Suarez, Jr., on the brief).

Edward W. Purcell, Associate Counsel, argued the cause for amici curiae New Jersey State League of Municipalities and New Jersey Institute of Local Government Attorneys

2

(William J. Kearns, Jr., General Counsel, attorney).

Albert G. Kroll submitted a brief on behalf of amicus curiae New Jersey State AFL-CIO (Kroll Heineman Carton, attorneys).

Cynthia J. Jahn, General Counsel, and Robert A. Greitz submitted a brief on behalf of amicus curiae New Jersey School Boards Association.

JUSTICE LaVECCHIA delivered the opinion of the Court.

In this appeal we review whether three municipalities were required to negotiate with union representatives before taking layoff actions that negatively impacted the hours and wages of affected employees. Two of the municipalities imposed on certain units of public employees mandatory, but temporary, layoffs, in the form of a reduced number of work days over a specified period of time, without negotiating those actions with union representatives. The third municipality eliminated as part of an overall layoff plan three full-time clerical positions and replaced them with part-time positions; as a result, the affected employees lost their eligibility for health benefits. That layoff action also was not negotiated with union representatives. However, all three layoff plans had been submitted and approved by the Civil Service Commission (Commission) as compliant with all civil service requirements for a layoff action.

3

After unions for public employees in each municipality brought scope-of-negotiations challenges to the municipal actions, the Public Employment Relations Commission (PERC), in separate decisions, held that the municipalities violated the New Jersey Employer-Employee Relations Act (EERA), N.J.S.A. 34:13A-1 to -39, and required each municipality to negotiate the changes in terms and conditions of employment.

The Appellate Division consolidated these appeals and reversed PERC's determinations, finding the municipal actions non-negotiable in all but one respect not pertinent to this appeal.

Employee rights in these three circumstances are determined by application of the three-part test set forth in Local 195, IFPTE v. State, 88 N.J. 393, 404-05 (1982), for resolving questions about the scope of public sector employment negotiations. Based on that test, we conclude that the negotiability of these three layoff plans hinges on application of the third prong of the Local 195 analysis that takes into account whether negotiation would significantly interfere with a management determination of governmental policy. Ibid.

Municipalities governed by the civil service system have the right to lay off employees when facing exigent financial circumstances. A regulation authorizing temporary layoffs, which enabled municipalities to address fiscal distress in such

4

a manner, was in effect when these layoff plans were developed and approved by the Commission, although the municipalities claim that they did not act pursuant to its authority when seeking Commission approval. Although the regulation since has been repealed, its validity is not challenged in this matter. The fact that it authorized temporary periods of layoffs during times of exigent fiscal circumstances is significant in our review. Whether the municipalities actively relied on that existing regulation is not controlling of our analysis.

In reviewing each of these disputes under the third prong of Local 195, PERC initially took the position that the civil service employer had to show that it had no other option but to engage in the layoff in order for managerial policy interests to predominate over the interests of employees in maintaining the terms and conditions of their employment. According to PERC, only upon making such a showing could a public entity employer demonstrate the necessary fiscal urgency to support a finding that the layoff action was non-negotiable based on Local 195's third, or managerial-prerogative, prong. PERC has retreated from that position in this appeal and in a subsequent agency quasi-judicial determination that it has brought to our attention. In our view, PERC's former position mistakenly set the bar too high when assessing managerial prerogative exercised

5

by local governments confronting fiscal distress, as was the case in these matters.

For the reasons expressed herein, we hold that at the time that they occurred, the layoff actions at issue were non-negotiable under the third prong of the Local 195 test.  We therefore affirm the Appellate Division judgment, as modified by this opinion.

I.

In 2009, the New Jersey municipalities of Belmar, Mount Laurel, and Keyport (collectively the municipalities or respondents), were experiencing financial strain.  All three municipalities were operating under collective negotiation agreements (CNAs) with unions representing municipal employees.  Following various efforts to confront their individual budget crises, each municipality obtained approval from the Commission for a layoff plan, described in detail hereinafter.  Generally stated and as pertinent to this appeal, the layoff plans, in varying ways, reduced workers' hours and therefore impacted wages.  The following facts and procedural history are culled from the record created before PERC.

A.

The Borough of Keyport (Keyport) and the International Union of Operating Engineers, Local 68 (Local 68), representing Keyport's clerical employees, entered into a CNA effective

6

January 1, 2008, through December 31, 2010.  Among other terms, Article 33 granted Keyport the management right to assign employees' schedules, and Article 5 provided that in the event of a layoff, Keyport would respect employees' seniority rights. Article 8 specified that the "work week for all bargaining unit employees shall be from Monday through Friday, and shall consist of five (5) consecutive seven and one-half (7½) hour work days for a thirty-seven and one-half (37½) hour work week."

In 2009, Keyport was experiencing significant financial difficulties in light of a pervading and lingering economic downturn.  Keyport faced increased healthcare, pension, and labor costs without an increase in tax revenues; in 2008, it had a budget surplus of less than $6,000.  After efforts to control expenses did not alleviate the strain, Keyport submitted a traditional layoff plan to the Commission on May 20, 2009.  In order to reduce personnel expenses, the plan, in pertinent part, converted three full-time clerical positions -- two in the Construction Department and one in the Office of the Registrar -- into part-time positions.[1]  Those layoffs did not have an

---

[1] The plan also demoted one police sergeant to a police officer and permanently laid off one police officer; however, those decisions are not at issue in this appeal.  Also, by virtue of the change to part-time positions, the three clerical employees would lose health insurance coverage.  That issue too is not on appeal, as a result of the Appellate Division's unchallenged affirmance of PERC's remand for arbitration on that benefits issue.

identified end date; the proposed layoff therefore permanently eliminated the full-time positions and converted them to part-time positions.  The layoff plan represented that the reductions "[we]re necessary for reasons of economy and efficiency."  In particular, the plan stated that Keyport's preliminary 2009 budget exceeded the levy cap by $135,000 and that "the Borough must reduce its appropriations so that it may lawfully adopt a budget for 2009."  The Commission approved the plan on May 22, 2009.

In August 2009, Local 68 filed an unfair-practice charge with PERC, alleging that Keyport violated the parties' CNA by reducing the three employees' hours without first negotiating with union representatives.  Prior to that, Keyport had filed a scope-of-negotiations petition with PERC, seeking to restrain binding arbitration of a grievance filed by the union.  That grievance had claimed a violation of the CNA as a result of the reduction in the workweek of the employees in the Building Department and Registrar's Office.  Thus, both the grievance and the unfair-practice charge related to the claim of work hour reduction.  The parties filed cross-motions for summary judgment on the unfair-practice charge.  On September 23, 2010, PERC granted Local 68's motion, concluding that EERA required Keyport to negotiate with Local 68 before reducing the employees' hours

8

from full-time to part-time and ordering that Keyport commence negotiations immediately.

In determining that the reduction in hours was mandatorily negotiable, PERC applied the three-part negotiability test from Local 195, supra, 88 N.J. at 404-05. After determining that the hour and benefits decision "intimately and directly affects the work and welfare" of the clerical workers (the first Local 195 factor), see id. at 404, PERC, in analyzing Local 195's third factor, determined that Keyport did not have the managerial prerogative to unilaterally implement the position reductions to part-time because negotiations in the present case would not significantly interfere with governmental policy. In support, PERC cited "the long line of judicial and Commission precedents" determining that workweek reductions are mandatorily negotiable, and reasoned that even significant budgetary concerns "must be presented and protected through the negotiations process."

PERC also concluded that Keyport's compliance with the Civil Service Act, N.J.S.A. 11A:1-1 to 12-6, and regulations did not preempt negotiation over the employees' hours (Local 195's second factor). PERC reasoned that the Civil Service Act and regulations "do not mandate a reduction in work hours or otherwise restrict the Borough's discretion to decide whether or not to reduce work hours," and, moreover, that "the Civil Service Act and [EERA] provide employees with separate and

9

distinct rights," such that compliance with the Civil Service Act does not negate employees' right to negotiate under EERA. In so holding, PERC distinguished the present case from State of New Jersey (Department of Environmental Protection) v. Communications Workers of America, AFL-CIO, 285 N.J. Super. 541, 544, 546, 553 (App. Div. 1995), certif. denied, 143 N.J. 519 (1996) [hereinafter DEP], in which the Appellate Division affirmed a prior PERC determination that the New Jersey Department of Environmental Protection's decision to reduce employee workweeks from forty to thirty-five hours was preempted and non-negotiable. PERC's reasoning emphasized that DEP represented a "'narrow exception to the normal preemption analysis, because of the nature and amount of pertinent regulations regarding State employees,'" (quoting id. at 550).

B.

The Borough of Belmar (Belmar) and the Communications Workers of America, AFL-CIO (CWA), the union representing all employees of the Department of Public Works (DPW), entered into a CNA effective January 1, 2005, through December 31, 2009. Article 7 of the CNA provided that "working hours shall be forty (40) hours per week for all employees in the bargaining unit," and Article 11 provided that each of the covered employees would receive a 3.9% wage increase in 2005 and a four percent increase each year from 2006 through 2009. In addition, Article 18

10

provided that Belmar would "discuss any proposed layoff with the union, in order to explore all avenues and methods."

Like Keyport, Belmar was experiencing financial difficulties in 2009 as a result of the economic downturn.  To combat its fiscal trouble, borough administrators agreed to wage cuts; in addition, Belmar met with unions representing municipal employees to ask them to accept a wage freeze.  Some unions acquiesced to a freeze, but Belmar and CWA could not reach an agreement.  In August 2009, Belmar submitted a "temporary layoff plan" to the Commission for approval, which provided for ten involuntary unpaid furlough days for all DPW employees during the period of October 6, 2009, through December 15, 2009.  In its plan, Belmar described the furloughs as necessary to achieve a budget that would comply with the State-mandated tax levy cap. The Commission approved the plan.

CWA filed an unfair-practice charge with PERC in October 2009, alleging that Belmar's imposition of the unpaid furlough days violated the parties' CNA and that Belmar was required to negotiate that change in terms and conditions of employment. The parties filed cross-motions for summary judgment and, on October 28, 2010, PERC granted CWA's motion.  As in the Keyport decision, PERC determined that the furloughs met the first prong of the Local 195 test given that the furloughs reduced working hours.  PERC largely relied on its analysis in Keyport to

11

determine that the Civil Service Act did not preempt EERA under the second Local 195 factor.

Finally, in respect of the third Local 195 prong, PERC determined that Belmar "did not have a managerial prerogative to unilaterally reduce the employees' compensation and workweek." PERC reasoned that case law has "consistently distinguished the non-negotiability of permanent staffing reductions from the negotiable issues of reductions in employees' work years, workweeks, and work hours. . . . That is so even when the latter reductions could be labeled layoffs under education or Civil Service Laws." In addition, in applying the balancing of interests called for under this third factor of Local 195, PERC concluded that "the interest in a viable negotiations process is preeminent because the budgetary considerations are dominant and there is no particularly significant governmental policy purpose at stake." PERC noted that the hour cuts allowed Belmar to avoid laying off just one employee and criticized Belmar for not proving "that reducing the workweek rather than laying off a single employee was needed to keep any programs running or to achieve any governmental policy purpose."

Accordingly, PERC concluded that negotiation was required before Belmar could impose the furloughs.

C.

12

The Township of Mount Laurel (Mount Laurel) and the American Federation of State, County and Municipal Employees, Council 71, South Jersey Public Employers (AFSCME), entered into a CNA effective January 1, 2005, through December 31, 2008. The CNA provided for yearly salary increases from 2005 through 2008. Article 2, entitled "Management Rights," stated that Mount Laurel had the right to institute layoffs "in the event of lack of work or funds or under conditions where continuation of work would be inefficient and non-productive." Additionally, Article 7 stated that "the regularly scheduled workweek shall consist of five (5) consecutive days, Monday through Friday," and that an employee's regular hours of work were not subject to change, "except as required under emergency conditions or agreed upon by both parties."

Like Keyport and Belmar, Mount Laurel faced serious financial problems in 2009. In June 2009, Mount Laurel representatives met with union representatives to request temporary salary and wage concessions to alleviate the financial strain, but the parties could not reach an agreement. In August 2009, Mount Laurel submitted a temporary layoff plan to the Commission, which called for the imposition of eight involuntary furlough days between November 20, 2009, and June 18, 2010, on all township employees except police and emergency medical personnel. In its proposal, Mount Laurel stated that the

13

purpose of the temporary layoffs was to help offset the township's budget crisis and to address restoration of the township's budgetary surplus, which had decreased by half in 2009. The Commission approved the plan in October 2009.

Shortly thereafter, AFSCME filed an unfair-practice charge with PERC, alleging that Mount Laurel's unilateral imposition of the furlough days without negotiation violated the employees' rights under the parties' CNA and EERA. The parties filed cross-motions for summary judgment. On October 28, 2010 -- coincident with PERC's issuance of its negotiability determination in the Belmar case -- PERC issued a decision on the cross-motions for summary judgment, holding that Mount Laurel's decision to impose furloughs was a mandatory subject of negotiation. PERC's decision relied on its analysis in the Belmar case in respect of the first two prongs of the Local 195 test, thus concluding that the furloughs directly affected employee work and welfare and that the subject of negotiation was not preempted by statute or regulation.

On the third Local 195 factor, PERC engaged in the fact-specific balancing of interests test to conclude that this factor also weighed in favor of negotiability. See Local 195, supra, 88 N.J. at 404-05. Weighing the interests of the parties, PERC noted that decisions affecting compensation and hours of work are traditionally negotiable. PERC concluded that

14

Mount Laurel's objective was to increase the size of its budgetary surplus, finding that Mount Laurel had failed to "produce[] any evidence to establish that it [wa]s without alternatives to achieve the same savings without furloughing its employees." Accordingly, PERC determined that Belmar did not have the managerial prerogative to reduce employees' workweek, stating that, on balance, "the interest in a viable negotiations process is preeminent because the budgetary considerations are dominant and there is no particularly significant governmental policy purpose at stake." Having concluded that the furlough decision required negotiations, PERC ordered the parties to commence negotiations.

D.

The three municipalities appealed their PERC administrative determinations to the Appellate Division, see R. 2:2-3(a)(2), which consolidated the cases on appeal. The panel reversed PERC's decisions as to Belmar and Mount Laurel and as to Keyport's hour reduction, holding that the towns were not obligated to negotiate the imposition of unpaid furloughs or the reduction from full-time to part-time status. The Appellate Division observed that the Commission had approved all three municipalities' layoff plans during the time when the Commission's emergency regulation permitting "temporary layoffs," N.J.A.C. 4A:8-1.1A, was in effect. The panel further

15

noted that the emergency temporary layoff regulation previously had been challenged and upheld in the Appellate Division. It thus framed the present issue as "whether the public employers' actions, which were effectuated in compliance with the Civil Service Act, were nevertheless subject to negotiation under the EERA."

Applying the three-part test from Local 195 for determining the scope of public sector employment negotiations, the panel determined that the unions met the first prong because all of the actions at issue directly affected the work and welfare of public employees. However, aside from Keyport's action eliminating health benefits, the panel concluded that "the unions did not satisfy the second and third prongs of the [Local 195] test because the municipalities' actions complied with the Civil Service Act and its regulations, and the decisions to furlough and demote employees were non-negotiable policy determinations." The panel affirmed the order in Keyport that required arbitration of the health benefits issue but reversed PERC in respect of the reduction in hours in Keyport and in all respects in the Mount Laurel and Belmar cases.

Local 68 filed a petition for certification, and CWA and AFSCME filed a joint petition for certification, collectively raising the issue of whether the municipalities' reduction in hours -- via furloughs in Belmar and Mount Laurel, and via

16

permanent reduction from full-time to part-time status in Keyport -- were mandatorily negotiable decisions under EERA. The Court granted both petitions.  216 N.J. 366 (2013).

## II.

### A.

Petitioners CWA, AFSCME, and Local 68 (collectively petitioners) argue that the Appellate Division erred in holding that the respondents' decisions to implement layoff plans by imposing unpaid furlough days and by demoting full-time employees to part-time positions were non-negotiable.  Each petitioner contends that the Appellate Division failed to properly apply the three-prong negotiability balancing test set forth in Local 195, supra, 88 N.J. at 404-05.

First, petitioners argue that, under the second prong of the Local 195 test, the Appellate Division should have held that temporary layoff plans are negotiable because EERA imposes a negotiation requirement on public employers and that obligation is not preempted by the Civil Service Act and accompanying regulations (Civil Service law).  Petitioners point out that, although the Civil Service law grants civil service employers the discretion to reduce labor costs by unilaterally imposing layoffs, the Civil Service law does not compel them to do so.  Therefore, petitioners argue, civil service employers are not precluded from complying with the provisions of EERA as well as

17

Civil Service law. CWA and AFSCME cite the Appellate Division's holding in Piscataway Township Board of Education v. Piscataway Township Principals Ass'n, 164 N.J. Super. 98 (App. Div. 1978), as support for that proposition.

Second, petitioners argue that, under the third prong of the Local 195 test, mandatory negotiations in these cases would not significantly interfere with any managerial prerogatives or governmental policies of the civil service employers. Addressing the arguments of Mount Laurel and Belmar in particular, CWA and AFSCME argue that the employees' interest in negotiating work hours and compensation outweighs Mount Laurel's interest in increasing its budget surplus, as well as Belmar's interest in avoiding the need to lay off a single employee. CWA and AFSCME add that neither Mount Laurel nor Belmar produced evidence to prove that the inability to increase a budget surplus or the loss of one employee would adversely affect any public operations or programs. All petitioners argue that although workforce reductions are non-negotiable managerial prerogatives, work-hour and compensation reductions of the type at issue here are not. Petitioners contend that if these temporary layoff plans are deemed managerial prerogatives, civil service employers would be permitted to disguise unilateral cuts in hours and compensation as "layoffs" in order to avoid their obligation to negotiate those changes under EERA. Petitioners

18

also argue that the temporary layoff plans are not managerial prerogatives because the purely fiscal or budgetary considerations that petitioners assert were at issue in all three cases do not involve governmental policy.

Finally, all petitioners express concern that if civil service employers are permitted to reduce hours and compensation without negotiating and without demonstrating exigency, the provisions of CNAs may be violated with impunity, undermining the salutary public policy of promoting labor-relations stability through the collective negotiations process.

B.

Respondents Keyport, Belmar, and Mount Laurel maintain that the Appellate Division properly applied the Local 195 negotiability test in determining that the layoff plans were non-negotiable.

First, respondents argue that their layoff actions are non-negotiable under prong two of the Local 195 test because the Civil Service law preempts the negotiation requirement imposed by EERA. All respondents argue that the Legislature must have intended the Civil Service law governing layoffs to fully occupy that field because it provides specific, comprehensive procedures by which civil service employers may implement layoff plans, which require consultation rather than negotiation. Belmar asserts that both Civil Service law and EERA contain

19

references indicating that the Civil Service law should prevail in case of a conflict.  N.J.S.A. 11A:11-2(j); N.J.S.A. 34:13A-8.1.  Keyport and Mount Laurel cite to DEP, supra, 285 N.J. Super. at 551-52, where the Appellate Division referred to Civil Service law as providing a comprehensive layoff scheme that preempts the EERA negotiation requirement.

Relatedly, respondents contend that requiring civil service employers to negotiate before implementing temporary layoff plans in compliance with Civil Service law would negate Commission regulations designed to help civil service employers pass legally compliant budgets in times of fiscal exigency without permanently cutting employee positions.  Respondents maintain that mandated negotiations would likely derail and certainly delay implementation of temporary layoff plans, undermining the feasibility of using temporary layoff plans to address the immediate effects of present fiscal distress.

Further, respondents argue that even if the Civil Service law does not preempt EERA's negotiation requirement, the decision to implement a temporary layoff plan must be non-negotiable under the third prong of the Local 195 analysis because it involves managerial prerogatives pertaining to the determination of governmental policy.  All respondents argue that case law generally has established that a civil service employer's decision to reduce employees' work weeks or work year

20

for economic reasons is a non-negotiable matter of governmental policy. Belmar argues that its temporary layoff plan was non-negotiable, relying on Council of New Jersey State College Locals v. State Board of Higher Education, 91 N.J. 18, 32 (1982), which supports that the determination of whether layoffs are necessary involves a matter of managerial prerogative. Keyport and Mount Laurel again point to DEP, supra, 285 N.J. Super. at 551-52, in arguing that the Appellate Division has recognized that work week reductions stemming from good-faith economic, efficiency, or budgetary concerns are matters of non-negotiable managerial prerogative.

All respondents argue that temporary layoff plans involve non-negotiable governmental policy determinations because civil service employers must make delicate decisions concerning the allocation of funds in order to provide services to taxpayers and residents in times of financial exigency. Specifically, Mount Laurel emphasizes that mandatory negotiation would interfere with civil service employers' ability to use temporary layoff actions to adjust in a timely manner to exigent changes in economic conditions.

C.

Amici New Jersey State AFL-CIO (NJ AFL-CIO) and New Jersey Education Association (NJEA) reinforce petitioners' arguments that temporary layoffs in the form of unpaid furlough days and

21

demotions must be negotiated pursuant to EERA. NJ AFL-CIO adds that the PERC decisions below were entitled to a high degree of deference and asserts that the Appellate Division decision conflicts with decades of legal precedent and the public interest in maintaining stable labor relations. NJEA similarly advances many of petitioners' arguments, emphasizing that Civil Service law does not contain preemptive language and that, regardless of whether labeled a "layoff," a public employer's decision to reduce work hours or compensation is mandatorily negotiable.

New Jersey School Boards Association (NJSBA) and New Jersey State League of Municipalities (NJSLM) support the arguments advanced by the municipal respondents. They argue that layoff plans implemented in compliance with the Civil Service Act and regulations are non-negotiable. NJSBA analogizes the municipalities' authority to implement layoff plans pursuant to the Civil Service law to its authority to reduce teaching staff pursuant to N.J.S.A. 18A:28-9.[2] NJSLM adds that an appellate court does not owe deference to PERC interpretations of Civil Service regulations or of the doctrine of preemption.

D.

---

[2] NJSBA maintains that Piscataway Township Board of Education, supra, 164 N.J. Super. 98 -- relied upon by petitioners -- has been impliedly rejected by courts because it incorrectly interprets and applies N.J.S.A. 18A:28-9.

PERC filed a statement in lieu of brief, asserting that PERC's "expert judgment should be accepted" in these cases. However, at oral argument, PERC's general counsel indicated that PERC had changed its position and informed the Court that PERC now asserts that sufficient information in the record established that the municipalities' decisions in these three cases were non-negotiable managerial prerogatives under prong three of the Local 195 test. Underscoring that point, PERC's counsel brought to the Court's attention a November 2013 PERC decision in which PERC determined that the Robbinsville Township Board of Education's decision to implement furlough days was a proper exercise of managerial prerogative.

### III.

The analytic framework for this matter is derived from this Court's seminal case Local 195, supra, 88 N.J. 393, in which the scope of collective negotiations for public employers and employees was addressed.

In that case, the State and several unions representing public employees disagreed as to the negotiability of contractual provisions concerning limitations on contracting and subcontracting, establishment of a workweek, and transfer and reassignment determinations. Id. at 398-400. The Court's decision focused on establishing a test for determining whether those types of decisions came within the proper scope of

23

collective negotiations for the public sector.  See id. at 403-05.  The Court stated that although "public employees have a legitimate interest in . . . collective negotiations" in respect of issues affecting the terms and conditions of their employment, "the scope of [collective] negotiation[] in the public sector is more limited than in the private sector."  Id. at 401.  Unlike a private employer, a public employer, as government, has "the unique responsibility to make and implement public policy."  Id. at 401-02 (citing Paterson Police PBA Local No. 1 v. City of Paterson, 87 N.J. 78, 86 (1981); State v. State Supervisory Emps. Ass'n, 78 N.J. 54, 67 (1978)).  Public policy, the Court explained, properly is determined through the political process, by which citizens hold government accountable, and not through collective negotiation.  Id. at 402 (citing Ridgefield Park Educ. Ass'n v. Ridgefield Park Bd. of Educ., 78 N.J. 144, 163 (1978)).  Thus, public employment negotiation has been divided into two categories:  "'mandatorily negotiable terms and conditions of employment and non-negotiable matters of governmental policy.'"  Ibid. (quoting Ridgefield Park Educ. Ass'n, supra, 78 N.J. at 162).

In light of the competing interests of a public employer and public employees, the Court stated in Local 195 that "[t]he role of the courts in a scope of negotiations case is to determine . . . whether an issue is appropriately decided by the

24

political process or by collective negotiations." Ibid. Thus, in Local 195, the Court articulated a three-part test for weighing those interests, establishing that a subject is negotiable when: "(1) the item intimately and directly affects the work and welfare of public employees; (2) the subject has not been fully or partially preempted by statute or regulation; and (3) a negotiated agreement would not significantly interfere with the determination of governmental policy." Id. at 404.

In respect of the first factor, "rates of pay and working hours" are noted models for the type of subjects that "'intimately and directly affect[] the work and welfare of public employees.'" Id. at 403 (quoting Paterson Police PBA, supra, 87 N.J. at 86). A subject is preempted, and therefore non-negotiable under the second factor, when a statute or regulation "'speak[s] in the imperative and leave[s] nothing to the discretion of the public employer.'" Id. at 403-04 (quoting State Supervisory Emps. Ass'n, supra, 78 N.J. at 80). However, under this prong of the analysis, the Court explained that a subject remains negotiable when a statute or regulation related to that subject preserves employer discretion; similarly, when statutes or regulations set minimum or maximum standards in respect of a subject, the subject is negotiable within the limits of those standards. Id. at 403.

25

The third factor requires that interference with the determination of government policy be significant in order to defeat negotiability.  Id. at 404.  The Court explained that consideration of the third factor arises out of recognition "that most decisions of the public employer affect the work and welfare of public employees to some extent and that negotiation will always impinge to some extent on the determination of governmental policy."  Ibid. (citing Paterson Police PBA, supra, 87 N.J. at 91-92).  Thus, in order to determine whether negotiation on a particular subject would significantly interfere with the formulation of government policy,

> it is necessary to balance the interests of the public employees and the public employer. When the dominant concern is the government's managerial prerogative to determine policy, a subject may not be included in collective negotiations even though it may intimately affect employees' working conditions.
>
> [Id. at 405.]

Neatly summed up, a matter's negotiability turns not "on the talismanic application of labels such as 'terms and conditions of employment' or 'managerial prerogatives[]' [but r]ather, the inquiry focuses on the extent to which collective negotiations will interfere with the establishment and effectuation of governmental policy."  Id. at 420 (Handler, J., concurring and dissenting).

26

Applying those factors to the facts at hand, the Local 195 Court concluded that the contractual provisions under review relating to the subjects of contracting and subcontracting were non-negotiable because negotiation would interfere significantly with the determination of government policy. Id. at 408 (majority opinion). The Court analogized the dominant policy concerns in respect of decisions about contracting and subcontracting to the policy determinations present in decisions to reduce the work force for economy and efficiency, which this Court has recognized as non-negotiable.[3] Ibid. (citing State Supervisory Emps. Ass'n, supra, 78 N.J. at 88). The Court further held that the provisions regarding workweek hours by individual employees were negotiable -- the balance of interests on the third prong favored negotiation because negotiation would not impede the State's ability "to determine the number or classification of employees on duty at any time." Id. at 411. Finally, the Court held that provisions relating to the substantive decision to transfer or reassign an employee were non-negotiable policy determinations, but that provisions

---

[3] The Court noted that a CNA "could contain a provision requiring [a public employer] to discuss . . . economic aspects of subcontracting" when it is being considered "for purely fiscal reasons," but discussion was not equated to negotiation; that said, the procedural aspects to subcontracting were held to be a proper subject of collective negotiations. Id. at 420.

relating to procedures for transfer and reassignment were negotiable.  Id. at 417.

With the Local 195 test as the indisputable test guiding our analysis in scope of negotiations matters, we apply it to the public employer actions in issue here.

IV.

A.

Prong one of the Local 195 test is not in issue in this matter.  In all three disputes, the layoff actions resulted in reduced hours of work, with resultant reductions in pay, for the affected employees.  Those actions by each municipality impacted terms and conditions of work for their employees.  See, e.g., Bd. of Educ. of the Woodstown-Pilesgrove Reg'l Sch. Dist. v. Woodstown-Pilesgrove Reg'l Educ. Ass'n, 81 N.J. 582, 589 (1980) (noting "[r]ates of pay and working hours . . . appear to be items most clearly falling within th[e]" terms-and-conditions "category" (citation omitted)).  PERC and the Appellate Division properly so found, and all respondents recognize as much.  There is no need to dwell further on Local 195's first prong.

Prongs two and three of the Local 195 test are the factors in issue in these matters.  The Appellate Division concluded that the preemption prong precluded negotiation of the layoff actions in all three matters and reversed PERC on that basis. The panel also found that PERC erred in concluding that

28

negotiation was not barred under prong three, basing that determination upon assessment of the predominant managerial prerogative interest in pursuing the layoffs in these three civil service communities facing financial distress.  We therefore turn to prongs two and three.

B.

1.

The preemption standard for prong two of the Local 195 test is clear in its limits and rigid within its parameters.  When legislation or a regulation "establishes a specific term or condition of employment that leaves no room for discretionary action, then negotiation on that term is fully preempted." Local 195, supra, 88 N.J. at 403; see State Supervisory Emps. Ass'n, supra, 78 N.J. at 80-82 (establishing that preemption doctrine applies to validly promulgated regulations, such as civil service regulations).

That principle was reinforced in Bethlehem Township Board of Education v. Bethlehem Township Education Ass'n, 91 N.J. 38, 44 (1982):  "Negotiation is preempted only if the regulation fixes a term and condition of employment expressly, specifically and comprehensively."  (Citation and internal quotation marks omitted); see also Council of N.J. State Coll. Locals, supra, 91 N.J. at 26 (reiterating that preemption applies unqualifiedly to regulations affecting terms or conditions of employment when

29

adopted by regulatory agency having no direct employer interest over employees affected). For preemption to apply, there must be no room for debate on the matter of discretion: "The legislative provision must 'speak in the imperative and leave nothing to the discretion of the public employer.'" Bethlehem Twp., supra, 91 N.J. at 44 (quoting Local 195, supra, 88 N.J. at 403-04). Thus, it is beyond dispute that specific terms and conditions for public employment set by civil service statutes or regulations may not permissibly be negotiated. See State Supervisory Emps. Ass'n, supra, 78 N.J. at 80-82.

2.

Here the Appellate Division determined preemption to apply based on the promulgation of a civil service regulation that had permitted temporary layoffs of employees in State or local service, and that thereby benefitted civil service municipalities such as the three here claiming fiscal distress. See N.J.A.C. 4A:8-1.1A (temporarily adopted as emergency regulation on March 25, 2009; repealed effective December 21, 2009). Specifically and in pertinent part, the regulation had provided:

> An appointing authority in State or local service may institute a temporary layoff for economy, efficiency or other related reasons. A temporary layoff shall be defined as the closure of an entire layoff unit for one or more work days over a defined period or a staggered layoff of each employee in a layoff unit for one or more work days over a defined

30

period. A temporary layoff shall be considered a single layoff action even though the layoff of individual employees takes place on different days during the defined period. The defined period shall be set forth by the appointing authority in its temporary layoff plan; however, in a staggered layoff, the maximum period to stagger one day off shall not exceed 45 days.

[41 N.J.R. 1537 (Apr. 6, 2009); N.J.A.C. 4A:8-1.1A(a).]

There is important background to that emergency regulation. The Commission adopted the emergency regulation at a time when New Jersey law had long recognized a public sector employer's right to take a layoff action impacting employees working in civil service jurisdictions of this State. The authorization for such layoff actions is set forth in the Civil Service Act, which provides that any "permanent employee may be laid off for economy, efficiency or other related reason." N.J.S.A. 11A:8-1(a). Civil service regulations fleshing out that authority were in place at all times relevant to these matters.

First, the regulations identify the reasons that would support a layoff action, and a "layoff action" is defined to include a demotion as well as loss of position:

(a) An appointing authority may institute layoff actions for economy, efficiency, or other related reasons.

1. Demotions for economy, efficiency, or other related reasons shall be considered layoff actions and shall be subject to the requirements of this chapter.

31

[N.J.A.C. 4A:8-1.1.]

Second, the mechanics of a layoff action are detailed in the civil service regulations. Public entity employers governed by Civil Service law are required first to consider alternatives to layoffs and to take a number of pre-layoff actions. See N.J.A.C. 4A:8-1.2, 1.3. The regulations suggest alternatives to layoffs, such as "[g]ranting voluntary furloughs," "[a]llowing voluntary reduction of work hours by employees," "[p]roviding employees with optional temporary demotional title changes," and other actions. N.J.A.C. 4A:8-1.2. The regulations require that the public entity employer take certain actions pre-layoff, "which may include, but are not limited to: 1. Initiating a temporary hiring and/or promotion freeze; 2. Separating non-permanent employees; 3. Returning provisional employees to their permanent titles; 4. Reassigning employees; and 5. Assisting potentially affected employees in securing transfer or other employment." N.J.A.C. 4A:8-1.3(a). Importantly, the public employer is required to "consult with" the union representatives of affected employees before "initiating measures under th[at] section." N.J.A.C. 4A:8-1.3(c).

Third, the regulations require Commission approval of a proposed layoff; therefore, when a public employer determines to proceed with a layoff action, civil service regulations detail what information must be submitted. See N.J.A.C. 4A:8-1.4(a).

32

That list of required information includes "[a] detailed explanation of all alternative and pre-layoff actions . . . taken, or . . . considered and determined [to be] inapplicable," and "[a] summary of consultations with" union representatives. N.J.A.C. 4A:8-1.4(a)(6), (7). If approved, final notice of layoff is provided to affected employees, N.J.A.C. 4A:8-1.6, and employees have appeal rights under the civil service system, N.J.A.C. 4A:8-2.6, including the right to challenge the good faith of the layoff, see N.J.A.C. 4A:8-2.6(a)(1) (permitting challenge based on assertion that employer acted "for reasons other than economy, efficiency or other related reasons").

The upshot to that detailed scheme is that the decision to proceed with a layoff is a heavily imbued management decision, but a discretionary one, subject to approval by the Commission for implementation.

3.

A layoff is an action that may be taken by a public sector employer, provided the employer follows and satisfies civil service regulatory requirements. The statute and implementing regulations that authorize a layoff of public sector employees do not require that such action affecting terms and conditions of employment be taken. They lack an imperative nature. Thus, the layoff statute and implementing regulations do not satisfy the essential requirement for preemption to pertain and preclude

33

negotiation based on the second prong of Local 195, supra, 88 N.J. at 403-04.

Indeed, we are unaware of any case, and have been directed to none, that has declared the determination to embark on a traditional layoff action to be non-negotiable based on the preemption prong of the test for determining the scope of negotiations. But see State Supervisory Emps. Ass'n, supra, 78 N.J. at 86-87 (explaining how civil service regulations comprehensively regulate and control mandatory scheme for determining seniority and reemployment rights in layoff, preempting mandatory negotiation of collateral layoff rights involving seniority, reemployment, and reinstatement).

When the new regulation governing temporary layoff actions was adopted as an emergency rule, its premise operated on the same discretionary basis. N.J.A.C. 4A:8-1.1A did not mandate an action by public sector employers affecting terms and conditions of employment for public employees. Adopted as an emergency measure, the regulation quickly offered public entity employers in civil service jurisdictions new discretionary forms of temporary layoff actions for use in addressing situations of fiscal distress.[4] Like the statute and regulations governing traditional layoff actions, see N.J.S.A. 11A:8-1(a); N.J.A.C.

_____

[4] For history of the regulation's repeal, see 41 N.J.R. 3139(a) (Sept. 8, 2009) (proposal of regulation's repeal) and 41 N.J.R. 4701(a) (adoption of regulation's repeal) (Dec. 21, 2009).

4A:8-1.1(a), we do not view N.J.A.C. 4A:8-1.1A as meeting the clear standard of an imperative required for preemption to apply.  Providing authority for a public sector employer to take temporary layoff action that has an impact on public employees' hours and wages -- paradigmatic examples of terms and conditions of employment -- does not impose a mandate as called for under Local 195's second prong for preemption.

The Appellate Division misperceived the import of that regulation and mistakenly found preemption to be applicable.  We conclude neither N.J.A.C. 4A:8-1.1A nor civil service statutes and regulations governing traditional layoff actions preempt negotiation on the basis of prong two of the Local 195 test of a decision to proceed with a layoff because that law does not set, as an imperative, a term and condition of employment for public employees governed by Civil Service law.  We turn therefore to the final and critical factor in the Local 195 test.

## V.

### 1.

Prong three of the Local 195 test holds that a subject may affect "the work and welfare of public employees" and nevertheless not be subject to negotiation.  Supra, 88 N.J. at 404.  Based on a well-established analysis performed under that prong, layoffs consistently have been held to be outside of the

scope of negotiations.  The reasoning is based on the balancing of interests required by prong three.

In explaining prong three, the Local 195 Court reaffirmed that most decisions by a public employer affect to some extent the work and welfare of public employees and that requiring negotiation in all such instances would impinge on the determination of public policy.  Ibid. (citing Paterson Police PBA, supra, 87 N.J. at 91-92).  When assessing the scope of required negotiations under prong three, those interests must be balanced:  "[N]egotiation will be allowed on a subject that intimately and directly affects the work and welfare of public employees unless such negotiated agreement would significantly interfere with the determination of governmental policy." Ibid.; see also Woodstown-Pilesgrove, supra, 81 N.J. at 591 ("When the dominant issue is [a governmental] goal, there is no obligation to negotiate and subject the matter, including its impact, to binding arbitration.").

Application of that balancing of interests under prong three has deep roots when it comes to the decision to lay off and thereby adjust a public workforce involved in the delivery of public services.  In State Supervisory Employees Ass'n, supra, our Court declared that the decision to "cut" a work force is "unquestionably . . . a predominantly managerial function."  78 N.J. at 88.  There is no room for mandatory

36

negotiation in the determination to reduce a workforce. See ibid.; cf. Council of N.J. State Coll. Locals, supra, 91 N.J. at 32 (stating same and citing examples of forms of workforce reduction); DEP, supra, 285 N.J. Super. at 551-52; DiMattia v. N.J. Merit Sys. Bd., 325 N.J. Super. 368, 374-75 (App. Div. 1999). That is so because such decisions go to the heart of governmental policy determinations about what services are to be provided and how they will be provided to the public. Public managers must be the ones accountable to the people for such substantive policy decisions. See Local 195, supra, 88 N.J. at 408; DEP, supra, 285 N.J. Super. at 553.

Scope-of-negotiations law addressing subcontracting follows that same reasoning. In Local 195, supra, our Court rejected the argument that a public employer's civil service right to lay off employees preempted subcontracting as a negotiable subject. 88 N.J. at 406. However, in concluding that the topic did not belong among those subject to negotiation, the Court found that the substantive decision to contract or subcontract significantly interfered with a determination of public policy. Id. at 407-08. The Local 195 Court was unanimous in stating its test for assessing the scope of required negotiations and the reason for keeping matters involving predominantly managerial prerogative out of the negotiations process. That explanation bears repeating in full.

37

The choice of how policies are implemented, and by whom, can be as important a feature of governmental choice as the selection of ultimate goals. It is a matter of general public concern whether governmental services are provided by government employees or by contractual arrangements with private organizations. This type of policy determination does not necessarily concern solely fiscal considerations. It requires basic judgments about how the work or services should be provided to best satisfy the concerns and responsibilities of government. Deciding whether or not to contract out a given government service may implicate important tradeoffs.

Allowing such decisions to be subject to mandatory negotiation would significantly impair the ability of public employers to resort to subcontracting. We have previously held that decisions to reduce the work force for economy or efficiency are non-negotiable subjects. The decision to contact out work or to subcontract is similarly an area where managerial interests are dominant. This is highlighted by the fact that allowing subcontracting to be negotiable may open the road to grievance arbitration. Imposing a legal duty on the state to negotiate all proposed instances of subcontracting would transfer the locus of the decision from the political process to the negotiating table, to arbitrators, and ultimately to the courts. The result of such a course would significantly interfere with the determination of governmental policy and would be inimical to the democratic process.

[Ibid. (citations omitted).]

2.

The Local 195 rationale informs our consideration of the expression of public policy contained in the Commission's temporary layoff rule. The Commission promulgated an emergency

38

regulation authorizing temporary layoffs while the extant financially distressing conditions, pervading the State and local communities, supported expansion of the layoff techniques available to State and local governmental appointing authorities governed by civil service requirements. The Commission's regulation authorized a layoff mechanism that offered local governmental appointing authorities a tool through which swift action may be taken to address pressing fiscal distress, as the municipalities in this appeal emphasize. In recognition of that clear expression of legitimate public policy authorizing such actions to be taken, it appears to us that a decision to reduce the workforce of employees within an identified layoff unit, even on a temporary basis in accordance with a duly authorized temporary layoff plan, is as much a managerial prerogative as the decision to layoff permanently, or to subcontract a function permanently or on a temporary basis.

Generically, all of the above-referenced actions go directly to a substantive policy determination about whether and how to deliver public services when delivery is affected by serious and pressing economic considerations. Economic reasons are indisputably a legitimate basis for a layoff of any type. See N.J.S.A. 11A:8-1(a) (authorizing layoff action based on reason of economy); N.J.A.C. 4A:8-1.1(a) (same); see also N.J.A.C. 4A:8-1.1(a)(1) (authorizing demotions for economy);

39

DiMattia, supra, 325 N.J. Super. at 374 (noting that civil service statutory and regulatory amendments had authorized public employer to take demotional layoff actions for budgetary reasons). Thus, a layoff -- including an authorized temporary layoff pursuant to a valid Commission regulation authorizing such action, or demotion in position from full to part-time status also pursuant to an approved layoff plan -- remains a management policy determination of considerable heft so long as economic or other recognized rationales support its use.

The temporary layoff actions at issue here were undertaken by municipalities at a time when the Commission's emergency regulation made available an additional management tool to address a pervading financial downturn that was affecting municipal budgets generally and, in particular, those of the municipalities involved here. Municipal budgets, structured on a cash basis, must be balanced annually, see N.J.S.A. 40A:4-2, -3, and regulations address proper municipal budgeting practices to promote healthy and responsible municipal governance, see N.J.A.C. 5:30-3.2 to -7.7. In each of these municipalities, the municipal government endeavored to maintain services in a responsible way in light of an economic downturn with no relief in sight. In each, the municipal appointing authorities took action while the emergency Commission regulation authorizing temporary, as well as permanent, layoff plans was in effect.

40

They acted based on extant Commission public policy that made those options available for use if other Commission layoff requirements were satisfied, including the consultative obligation with union representatives and the duty to pursue prior pre-layoff alternatives.

For those reasons, in the context of the cases consolidated before us, we cannot conclude that these matters required compelled negotiation. These civil service municipalities, when faced with fiscal exigency, had the right to lay off employees under prior case law and as buttressed by the emergency regulation then in effect authorizing temporary layoff actions. See N.J.A.C. 4A:8-1.1A. Although the emergency regulation since has been repealed, the regulation's validity is not challenged in this matter and it authorized temporary periods of layoffs during times of exigent fiscal circumstances when these municipal actions were taken. Whether the municipalities actively relied on that existing regulation is not controlling in our review of this appeal.

Even PERC, in its initial decisions in these matters, recognized that a management policy determination was involved in the decision to impose a temporary layoff and did not question the ability of management to take such policy action. Instead, it evaluated only the negotiability of the management decision and performed a balancing-of-interests analysis under

41

prong three of the Local 195 test. PERC found the decision to be negotiable. It based its determination on its own assessment of the fiscal need faced by each municipality and its own perception that other management policy choices could possibly address the financial distress the municipalities faced within the particular fiscal year in progress. Under PERC's initial analysis, each municipality was required to demonstrate that no other option was available in order for these layoffs to constitute a managerial prerogative that a municipal governing body could exercise in the face of the present circumstances of fiscal distress.

As noted, PERC now takes the position that, under the circumstances, these layoff actions were legitimate management prerogatives that ought not to have been ruled subject to negotiation. That second thought demonstrated the better judgment.

PERC erred in initially requiring each municipality to demonstrate that no other option was available before it could take the layoff measures of restricting workdays through a temporary layoff or eliminating full-time positions while covering tasks through part-time positions so services to the public continued. Those were management policy determinations that constituted prerogatives. They should not have been subjected to PERC's non-deferential "last option" standard. In

42

subjecting them to that standard, PERC's judgment failed to adhere to the teachings of Local 195 and related case law addressing workforce reductions; as a result, PERC mistakenly declared these layoff actions subject to negotiations. Adding negotiations as PERC would have required would have injected a whole new dimension, rendering policy determinations subject to the decisions of arbitrators and ultimately the courts. And, that review for negotiability -- over actions that needed to be accomplished swiftly in order to effectuate their intended prompt economic relief from the financial distress -- would come months, if not years, later. More fundamentally, the wrong decision makers would be setting policy for the municipalities. Local 195, supra, 88 N.J. at 407-08.

Certainly, under prong three of Local 195, an artificial "fiscal crisis" cannot outweigh important employee work and welfare interests. Some evaluation is necessary, and does occur during the Commission's approval process, which requires consideration of the asserted reason for the layoff's necessity. We note too that a good faith challenge is available under civil service regulations, see N.J.A.C. 4A:8-2.6(a)(1), and provides a more appropriate solution than invoking mandatory negotiation to zero in on any improper basis for a reduction in workforce action. See Local 195, supra, 88 N.J. at 425 (Handler, J., concurring and dissenting) (noting that mandatory negotiation

43

can be inapt solution to invoke, when other solutions for review of management action exist, because negotiation "route is cumbersome, inappropriate and potentially disruptive of governmental management").

Finally, we reject the argument that past decisions addressing and requiring negotiation of unilaterally imposed reductions to hours of work are at odds with the outcome reached here. The decisions cited have not arisen in the context of a bona fide layoff plan. See, e.g., Galloway Twp. Bd. of Educ. v. Galloway Twp. Ass'n of Educ. Sec'ys, 78 N.J. 1, 5-6 (1978) (addressing individual actions taken unilaterally against certain secretaries during collective negotiations with representative). When a layoff plan has been prepared to accommodate policy determinations about the efficient delivery of services when economy is a factor, the public management's right to reduce its workforce -- by a layoff or restructuring of the number and type of positions, full or part-time -- must be treated as a management prerogative. Several past appellate decisions properly have recognized the management prerogative present when a decision to proceed with a layoff is involved. See, e.g., DEP, supra, 285 N.J. Super. at 551-53; DiMattia, supra, 325 N.J. Super. at 374-75; see also Klinger v. Bd. of Educ. of Cranbury, 190 N.J. Super. 354, 357-58 (App. Div. 1982) (recognizing that reduction in force eliminating full-time

44

physical education teacher and creating instead two 7/10ths part-time teachers is within management's authority),[5] <u>certif. denied</u>, 93 <u>N.J.</u> 277 (1983).

All of the layoff actions challenged herein were reviewed by the Commission and approved for implementation as legitimate layoffs. There was an opportunity to appeal the "good faith" of each layoff under civil service regulations but that avenue was not pursued. Nor is there any challenge in any of these matters to the validity of the temporary layoff regulation that was in place at the time these actions were taken. At this late date, based on our review of the records presented, we are satisfied that all three municipalities acted for reasons of economy based on municipal fiscal distress existing at the time, rendering the management choice to use a temporary or permanent layoff solution one that constituted a managerial prerogative not subject to negotiation. We therefore hold that the layoff actions at issue in this consolidated appeal constituted non-negotiable subjects under prong three of the <u>Local 195</u> test for negotiability.

VI.

---

[5] We note but ascribe little weight to the earlier-in-time decision in <u>Piscataway Township Board of Education</u>, <u>supra</u>, 164 <u>N.J. Super.</u> 98. The facts in <u>Klinger</u> are more closely aligned to the present matter and its reasoning is more persuasive.

The judgment of the Appellate Division is affirmed, as modified by the reasoning expressed herein.

JUSTICES PATTERSON and SOLOMON, and JUDGE CUFF (temporarily assigned) join in JUSTICE LaVECCHIA's opinion. JUSTICE ALBIN filed a separate, dissenting opinion. CHIEF JUSTICE RABNER and JUSTICE FERNANDEZ-VINA did not participate.

IN THE MATTER OF BOROUGH OF
KEYPORT,

    Respondent-Respondent,

        v.

INTERNATIONAL UNION OF
OPERATING ENGINEERS, LOCAL
68,

    Petitioner-Appellant.

_____

IN THE MATTER OF BOROUGH OF
BELMAR,

    Respondent-Respondent,

        v.

COMMUNICATIONS WORKERS OF
AMERICA, AFL-CIO,

    Petitioner-Appellant.

_____

TOWNSHIP OF MOUNT LAUREL,

    Respondent-Respondent,

        v.

COMMUNICATIONS WORKERS OF
AMERICA,

    Petitioner,

       and

AFSCME, COUNCIL 71, SOUTH
JERSEY PUBLIC EMPLOYEES,

1

Petitioner-Appellant.

JUSTICE ALBIN, dissenting.

The majority opinion sweeps away nearly fifty years of this Court's public-sector labor jurisprudence, giving municipal employers the unilateral power to reduce the wages and hours of public employees promised in collective negotiations agreements. Before today, the cardinal principle guiding public-sector labor negotiations had been that the wages and hours of public workers are subject to negotiation -- not to a public employer's fiat. The simple precept that wages and hours are mandatorily negotiable is a common refrain not only in this Court's opinions, but also in the decisions of the Appellate Division, and the Public Employment Relations Commission (PERC).

In the name of a furlough, two municipalities reduced the wages and standard of living of an entire public-employee workforce unit in violation of the Employer-Employee Relations Act (EERA). Another municipality cut in half the hours and salaries of three workers, thus depriving them of health insurance. Each municipality could have laid off one to three workers to achieve its budgetary goal, which was to increase the municipal surplus. Instead, the municipalities chose to breach their collective negotiations agreements with their employees' unions. In all three cases, PERC -- the public body empowered

2

to enforce the EERA -- ruled that the unilateral actions of the municipalities contravened the EERA and the principle that wages and hours are mandatorily negotiable. The majority affirms the overthrow of all three PERC decisions.

The majority's endorsement of furloughs by fiat in non-emergent circumstances is a dismal sign for the future of public-sector collective negotiations. The temporary regulation promulgated by the Civil Service Commission on which the majority relies does not change the equation. When public employers can unilaterally reduce wages and hours of employees, there is not much left to negotiate. Because the majority's decision undermines the very foundation of collective negotiations, which is at the heart of the EERA, I respectfully dissent.

I.

A.

The Borough of Belmar and a local affiliate of the Communication Workers of America (CWA), which represents employees in Belmar's public-works department, signed a collective negotiations agreement (CNA) effective January 1, 2005 through December 31, 2009. That agreement provided that the workweek for each employee would be forty hours and that every employee would receive a 3.9% salary increase in 2005 and a 4.0% increase each year from 2006 through 2009. In 2008,

3

Belmar's budget surplus declined from $1,630,802 to $1,284,563. To offset the decrease in the surplus, Belmar requested that its employees forgo their 4% salary increase for 2009. The public-works department employees demanded that Belmar adhere to its agreement.

Taking the my-way-or-the-highway approach, Belmar furloughed the workers one day per week from October 6, 2009 through December 15, 2009, wiping out their 4% salary increase for 2009. Belmar could have achieved the same savings by laying off just one worker. Instead, it chose to reduce the hours and wages of the entire bargaining unit in violation of its agreement.

## B.

The Township of Mount Laurel and an affiliate of the American Federation of State, County and Municipal Employees, AFL-CIO (AFSCME), which represents the Township's blue-collar workers, entered into a CNA that ended on December 31, 2008. The agreement remained in effect after December 31, while the parties negotiated a new contract. The agreement set forth the work hours and wages of each employee.

In 2009, Mount Laurel's budget surplus declined to $600,000. To increase the surplus, the Township asked its blue-collar workers to accept a voluntary furlough of eight days over an eight-month period. The workers declined the offer. Mount

4

Laurel then involuntarily furloughed those employees for eight days -- a savings equivalent to laying off three employees.

## C.

The Borough of Keyport and a local affiliate of the AFL-CIO, which represents the Borough's clerical employees, entered into a CNA effective from January 1, 2008 through December 31, 2010. The agreement set forth each employee's work hours and wages, including a salary increase. The agreement provided that the newest employees would be laid off first, if layoffs were necessary.

Keyport experienced a decline in its budget surplus over a six-year period. In 2009, in response to its depleted surplus, the Borough took certain steps, which involved cutting in half the hours and wages of three clerical employees. Halving the salaries of those employees also resulted in the cancellation of their health benefits. The unauthorized actions taken by the Borough violated the CNA.

## D.

In all three cases, PERC found that the municipalities engaged in unfair labor practices by eschewing negotiations and peremptorily decreasing the hours and wages of the targeted employees. Relying on this Court's jurisprudence, PERC observed that "'surely working hours and compensation are terms and conditions of employment within the contemplation of the

5

Employer-Employee Relations Act.'" Borough of Belmar, P.E.R.C. No. 2011-34, 36 NJPER 405, 407 (2010) (quoting Bd. of Educ. of Englewood v. Englewood Teachers Ass'n, 64 N.J. 1, 6-7 (1973)). PERC determined that the municipalities could not justify their unilateral actions in violating their contractual commitments. For example, in the case of Belmar, PERC held that "[t]he Borough has not asserted that reducing the workweek rather than laying off a single employee was needed to keep any programs running or to achieve any governmental policy purpose." Id. at 408. In Township of Mount Laurel, P.E.R.C. No. 2011-35, 36 NJPER 409, 411 (2010), PERC found that the Township did not "produce[] any evidence to establish that it is without alternatives to achieve the same savings without furloughing its employees nor has it shown that any operations or programs would be hindered if it had to layoff employees to achieve the same budgetary savings instead of implementing temporary layoffs." PERC, in effect, concluded that the furloughing of employees was a disguise for driving down the wages of entire work units of employees.

PERC is a specialized administrative agency designated by statute to interpret, implement, and enforce the EERA. N.J. Tpk. Auth. v. AFSCME, Council 73, 150 N.J. 331, 335 (1997) (citing N.J.S.A. 34:13A-5.2). PERC brings expertise to the resolution of public-body labor disputes, City of Hackensack v.

6

Winner, 82 N.J. 1, 24 (1980), and its "interpretation of the [EERA] is entitled to substantial deference," N.J. Tpk. Auth., supra, 150 N.J. at 352. A PERC ruling should not be overturned "'unless it is clearly demonstrated to be arbitrary or capricious.'" In re Hunterdon Cnty. Bd. of Chosen Freeholders, 116 N.J. 322, 329 (1989) (quoting State v. Prof'l Ass'n of N.J. Dep't of Educ., 64 N.J. 231, 258-59 (1974)).

E.

The Appellate Division turned a blind eye to the deference owed to PERC decisions. It reversed, finding that an emergency civil service regulation authorized the Civil Service Commission to approve the municipalities' furlough and wage-and-hour-reduction plans. Relying on prong two (preemption) and prong three (managerial prerogative) of the test set forth in Local 195, IFPTE v. State, 88 N.J. 393, 404-05 (1982), the panel held that "the decisions to furlough and demote employees were non-negotiable policy determinations."

The majority concedes that the Appellate Division erred in finding that the civil service regulation preempted PERC. Ante at __-__ (slip op. at 35). Accordingly, the only remaining issue is whether -- as the majority argues -- the municipalities were exercising a managerial prerogative that allowed them to trump the principle guiding all collective negotiations: wages and hours are mandatorily negotiable. If the majority is

7

correct, then nearly fifty years of our jurisprudence is wrong. This Court has never held that the process of collective negotiations of wages and hours can be bypassed by a public employer unilaterally arrogating to itself the power to reduce wages and hours.

II.

"Public employees are given comprehensive rights under the Employer-Employee Relations Act." In re Hunterdon Cnty. Bd. of Chosen Freeholders, supra, 116 N.J. at 327; see also N.J.S.A. 34:13A-1 to 34:13A-43. Perhaps foremost among those rights is the right to freely negotiate with a public employer over the terms and conditions of employment. N.J.S.A. 34:13A-5.4(a)(5). The EERA forbids a public employer from "[r]efusing to negotiate in good faith with a majority representative of employees in an appropriate unit concerning terms and conditions of employment." Ibid. Public-sector labor negotiations break down into two categories: "'mandatorily negotiable terms and conditions of employment and non-negotiable matters of governmental policy.'" Local 195, supra, 88 N.J. at 402 (quoting Ridgefield Park Educ. Ass'n v. Ridgefield Park Bd. of Educ., 78 N.J. 144, 162 (1978)).

Whatever else terms and conditions of employment may mean, it has been universally accepted that wages and hours are terms and conditions of employment that public employers must negotiate with their employees. See id. at 412; State v. State

8

Supervisory Emps. Ass'n, 78 N.J. 54, 67 (1978) (noting that "working hours" and "compensation" are "the essential components of terms and conditions of employment" and must be negotiated); Galloway Twp. Bd. of Educ. v. Galloway Twp. Ass'n of Educ. Sec'ys, 78 N.J. 1, 6-8 (1978) (concluding that reducing full-time secretarial positions to part-time violated public employer's obligation to negotiate); Bd. of Educ. of Englewood, supra, 64 N.J. at 6-7 ("Surely working hours and compensation are terms and conditions of employment within the contemplation of the Employer-Employee Relations Act."); Burlington Cnty. Coll. Faculty Ass'n. v. Bd. of Trs., 64 N.J. 10, 12 (1973) (noting that "days and hours of work by individual faculty members . . . are mandatorily negotiable under the [Employer-Employee Relations Act]"); Boonton Bd. of Educ., P.E.R.C. No. 2006-98, 32 NJPER 239, 240 (2006) ("The number of hours an employee works and the employee's compensation and fringe benefits are all mandatorily negotiable terms and conditions of employment."); Gloucester Cnty., P.E.R.C. No. 93-96, 19 NJPER 244, 245-46 (1993) (noting that New Jersey "Supreme Court has consistently held that work hours are a mandatorily negotiable term and condition of employment" and that "short of abolishing a position, an employer must negotiate over reductions in the work year, work week, and work day of unit positions"); Stratford Bd. of Educ., P.E.R.C. No. 90-120, 16 NJPER 429, 430

9

(1990) ("[W]ork hours and compensation . . . [are] . . . mandatorily negotiable"); Bayshore Reg. Sewerage Auth., P.E.R.C. No. 88-104, 14 NJPER 332, 333 (1988) ("A public employer, short of abolishing a position, must negotiate over reductions in hours and compensation."); Willingboro Bd. of Educ., P.E.R.C. No. 86-76, 12 NJPER 32, 33 (1985) (concluding that cutting wages and hours by one-third of public employee cafeteria workers violated EERA and required mandatory negotiations); State of New Jersey (Ramapo State Coll.), P.E.R.C. No. 86-28, 11 NJPER 580, 581 (1985) ("[A]n employee's work year is a mandatorily negotiable term and condition of employment."); Cherry Hill Bd. of Educ., P.E.R.C. No. 85-68, 11 NJPER 44, 46 (1984) ("It has been well established since the first precedents interpreting the New Jersey Employer-Employee Relations Act that working hours are mandatorily negotiable."); Sayvreville Bd. of Educ., P.E.R.C. No. 83-105, 9 NJPER 138, 140 (1983) ("[A]n employer violates its duty to negotiate when it unilaterally alters an existing practice or rule governing a term and condition of employment, such as the length of the work year or the amount of an employee's salary . . . ."); Hackettstown Educ. Ass'n, P.E.R.C. No. 80-139, 6 NJPER 263, 263 (1980) ("[PERC] has consistently held that the length of the work year (or the abolition of 12 and 11 month positions and the creation of 10

10

month positions) is a mandatory term and condition of employment." (Footnotes omitted)).

Not just in New Jersey, but elsewhere, it has been a categorical imperative of public-sector collective bargaining that wages and hours must be negotiated. See Paul M. Secunda et al., Mastering Labor Law 185-87 (2014) (noting that wages and hours are mandatorily negotiable in public-sector collective bargaining); see also Nat'l Educ. Ass'n v. Bd. of Educ., 512 P.2d 426, 433 (Kan. 1973) (concluding that "terms and conditions of professional service" of public employees included wages and hours); Detroit Police Officers Ass'n v. City of Detroit, 233 N.W.2d 49, 52 (Mich. Ct. App. 1975) (noting that wages and hours "are mandatory subjects of collective bargaining" in public-employment setting); Clark Cnty. Sch. Dist. v. Local Gov't Emp.-Mgmt. Relations Bd., 530 P.2d 114, 117-18 (Nev. 1974) (noting that public employer must negotiate hours and wages with employees).

The Local 195 scope-of-negotiations test is not intended to resolve an issue about which there can be no dispute -- the negotiability of wages and hours in the public-sector setting.[1]

_____

[1] In assessing whether a matter is negotiable or non-negotiable, the Local 195 test requires a determination whether "(1) the item intimately and directly affects the work and welfare of public employees; (2) the subject has not been fully or partially preempted by statute or regulation; and (3) a negotiated agreement would not significantly interfere with the

11

The test is intended for matters, unlike wages and hours, that fall in the gray area between what is negotiable and non-negotiable. This point is made clear throughout our jurisprudence. If a matter clearly falls within the category of wages and hours, the inquiry is over. Thus, "[w]here the condition of employment is significantly tied to the relationship of the annual rate of pay to the number of days worked, then negotiation would be proper." Bd. of Educ. of Woodstown-Pilesgrove Reg'l Sch. Dist. v. Woodstown-Pilesgrove Reg'l Educ. Ass'n, 81 N.J. 582, 591 (1980).

In Woodstown-Pilesgrove, we held that negotiation was required when a board of education unilaterally extended a single school day by two hours without any additional compensation for the school's teachers. Id. at 593-94. Similarly, in Board of Education of Englewood, supra, 64 N.J. at 3, 6-7, we held that the unilateral extension of teachers' work day by an hour and three quarters without additional pay undoubtedly concerned "terms and conditions of employment within the contemplation of the Employer-Employee Relations Act" and had to be negotiated. Moreover, in Piscataway Township Board of Education v. Piscataway Township Principals Ass'n, 164 N.J.

determination of governmental policy." Local 195, supra, 88 N.J. at 404.

12

Super. 98, 101 (App. Div. 1978), the Appellate Division explained:

> [T]here cannot be the slightest doubt that cutting the work year, with the consequence of reducing annual compensation of retained personnel who customarily, and under the existing contract, work the full year (subject to normal vacations), and without prior negotiation with the employees affected, is in violation of both the text and the spirit of the Employer-Employee Relations Act.

Conversely, outside of the realm of wages and hours, we have held that a public employer is not required to negotiate matters that fall squarely within managerial prerogatives. See, e.g., Local 195, supra, 88 N.J. at 406-07, 417 (concluding that subcontracting as well as transfer or reassignment of employees are non-negotiable subjects); Paterson Police PBA Local No. 1 v. City of Paterson, 87 N.J. 78, 98 (1981) (holding that municipal decisions regarding organization and deployment of police forces are not negotiable); State Supervisory Emps. Ass'n, supra, 78 N.J. at 84 (finding that seniority relating to layoffs, recall, bumping and reemployment is preempted by civil service laws and therefore not negotiable).

The involuntary furloughing of an entire work unit -- cutting employees hours and wages, as occurred in Belmar and Mount Laurel -- is incompatible with this Court's holdings in Woodstown-Pilesgrove and Board of Education of Englewood and the Appellate Division's holding in Piscataway Township Board of

13

<u>Education</u>.  The involuntary halving of hours and wages of clerical workers is also incompatible with those cases.

III.

That the EERA and our case law require hours and wages to be negotiated does not place municipalities and other public entities in a budgetary strait jacket when revenues decline. The Civil Service Act provides that "permanent employee[s] may be laid off for economy, efficiency or other related reason." <u>N.J.S.A.</u> 11A:8-1(a).  In <u>Belmar</u>, the laying off of a single employee would have achieved the same savings as the furloughing of an entire work unit -- and without violating the collective negotiations agreement.  In <u>Mount Laurel</u> and <u>Keyport</u>, the municipalities had the option of laying off employees to accomplish the necessary savings rather than reducing the wages of workers.

In overturning the three PERC decisions, the majority relies on the emergency civil service regulation that was promulgated in March 2009 and repealed in December 2009, even though the municipalities did not rest their arguments on that regulation.[2]  <u>Ante</u> at __-__ (slip op. at 5).  In essence, the

---

[2] The emergency regulation provided that:

> An appointing authority in State or local service may institute a temporary layoff for economy, efficiency or other related reasons. A temporary layoff shall be defined as the

14

emergency regulation defined a layoff as synonymous with a furlough. That regulation allowed a municipality to submit a furlough plan for acceptance to the Civil Service Commission. Acceptance of the plan, however, did not mean a furlough was not negotiable.

A public employer's compliance with civil service regulations is not the end of the process, for the public employer must also satisfy the requirements of the EERA. Prosecutor's Detectives & Investigators Ass'n v. Hudson Cnty. Bd. of Chosen Freeholders, 130 N.J. Super. 30, 46 (App. Div.) ("Our duty is to read the Civil Service Act and the Employer-Employee Relations Act, as applied to the situations before us, so that both are harmonized and each is given its appropriate role."), certif. denied, 66 N.J. 330 (1974).

closure of an entire layoff unit for one or more work days over a defined period or a staggered layoff of each employee in a layoff unit for one or more work days over a defined period. A temporary layoff shall be considered a single layoff action even though the layoff of individual employees takes place on different days during the defined period. The defined period shall be set forth by the appointing authority in its temporary layoff plan; however, in a staggered layoff, the maximum period to stagger one day off shall not exceed 45 days.

[N.J.A.C. 4A:8-1.1A(a) (repealed December 21, 2009).]

Even the majority acknowledges that the regulation did not preempt the obligation of the municipality to negotiate. Ante at __-__ (slip op. at 35). Instead, the majority submits that -- based on the emergency regulation -- the municipalities were exercising a managerial prerogative and thus had the right to unilaterally furlough employees. Ante at __-__ (slip op. at 45). The majority focuses on prong three of the Local 195, supra, test: "a subject is negotiable between public employers and employees when . . . a negotiated agreement would not significantly interfere with the determination of governmental policy." 88 N.J. at 404.

However, the majority cannot point to any true emergency that compelled the municipalities to choose furloughs over traditional layoffs. As noted earlier, the layoff of just one employee in Belmar and the layoff of just three employees in Mount Laurel would have met the budgetary needs of those municipalities. Reducing the wages and hours of an entire unit was an exercise of raw political power by the municipalities and is incompatible with the EERA's requirement that the terms and conditions of employment be resolved through negotiation.

The majority's reliance on the emergency civil service regulation appears to be nothing more than preemption in disguise. The regulation should have been harmonized with the purposes animating the EERA. Here, furloughing is merely a name

16

invoked to justify the unilateral cutting of wages and hours of employees -- an action previously unacceptable under our jurisprudence.

Clearly, we live in difficult economic times in which municipalities struggle to balance their budgets. But the problems facing Belmar, Mount Laurel, and Keyport were and are no different than those facing a multitude of other municipalities. None of the municipalities in this case confronted an economic state of emergency so severe that it was left without other reasonable options than furloughing entire units of public employees.

By sanctioning the path taken by these municipalities, the majority has struck a stake in the heart of the collective negotiations process. A collective negotiations agreement is of little value when a municipality can unilaterally reduce the hours and wages of public employees by calling it a furlough. The power to furlough, moreover, is a powerful club that can be wielded at the negotiations table to coerce concessions.

In the end, there is a right way and a wrong way to achieve economy and efficiency consistent with the EERA. Cutting wages and hours of an entire work unit in violation of negotiated agreements -- by whatever name -- is not in keeping with our time-honored jurisprudence and the EERA.

IV.

17

Before the Appellate Division, PERC filed a thirty-three page brief arguing for affirmance of the three PERC decisions. In a March 2011 supplemental letter to the Appellate Division, PERC wrote: "The Commission's management, labor, and public members applied their knowledge of negotiations practices concerning compensation, workweek, and work schedules and agreed that the Borough had an obligation to negotiate the reduction in workweek, work year and compensation of the CWA unit members. That expert judgment should be accepted." In a letter to the Clerk of this Court concerning the present appeals, a Deputy Attorney General, on behalf of PERC's general counsel, wrote: "[T]he Commission takes no position on the Petitions for Certification" filed by the municipalities. PERC filed its Appellate Division brief with this Court. Then, with no prior notice given to this Court, PERC's general counsel made a complete about-face, announcing at oral argument that PERC had changed its mind and no longer stood behind the PERC decisions before us. In an exercise of circular reasoning, counsel pointed to a 2013 PERC decision, Robinsville Township Board of Education, P.E.R.C. No. 2014-30, 40 NJPER 253, 253-54 (2013), upholding the involuntary furlough of three teachers, which in turn relied on the very Appellate Division opinion in this case, whose approach PERC had strenuously opposed.

18

Merely because the composition of PERC has changed dramatically during the current administration does not mean that our standard of review should change. Counsel cannot be faulted for taking his orders from the newly composed PERC. But our review is from the PERC decisions before us. Deference applies to those decisions, regardless of the change of personnel on PERC. The majority is mistaken in accepting PERC's changed position to erode the traditional standard of review of the cases on appeal.

V.

By overruling the PERC decisions and endorsing the furloughs in these cases, even under the emergency civil service regulation, the majority has held that a negotiated agreement on wages and hours significantly interferes with the determination of government policy. That holding is not only contrary to our jurisprudence, it is also in conflict with the legislative policy enunciated in the EERA. Collective negotiations mean nothing if wages and hours are not on the table for discussion. One can only hope that the damage the majority inflicts on the collective negotiations process will be limited to the period the emergency civil service regulation was in effect.

I therefore respectfully dissent.

SUPREME COURT OF NEW JERSEY

NO.    A-43/44                          SEPTEMBER TERM 2013

ON CERTIFICATION TO        Appellate Division, Superior Court

IN THE MATTER OF BOROUGH OF KEYPORT,
     Respondent-Respondent,

        v.

INTERNATIONAL UNION OF
OPERATING ENGINEERS, LOCAL 68,
     Petitioner-Appellant.

IN THE MATTER OF BOROUGH OF BELMAR,
     Respondent-Respondent,

        v.

COMMUNICATIONS WORKERS OF
AMERICA, AFL-CIO,
     Petitioner-Appellant.

TOWNSHIP OF MOUNT LAUREL,
     Respondent-Respondent,

        v.

COMMUNICATIONS WORKERS OF AMERICA,
     Petitioner,

        and

AFSCME, COUNCIL 71, SOUTH
JERSEY PUBLIC EMPLOYEES,
     Petitioner-Appellant.


DECIDED              July 14, 2015
         Justice LaVecchia                          PRESIDING

OPINION BY              Justice LaVecchia

CONCURRING/DISSENTING OPINIONS BY

DISSENTING OPINION BY      Justice Albin

| CHECKLIST | AFFIRMED AS MODIFIED | DISSENT |
|---|---|---|
| CHIEF JUSTICE RABNER | -------------------- | -------------------- |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | | X |
| JUSTICE PATTERSON | X | |
| JUSTICE FERNANDEZ-VINA | -------------------- | -------------------- |
| JUSTICE SOLOMON | X | |
| JUDGE CUFF (t/a) | X | |
| TOTALS | 4 | 1 |